**THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| OPTIMIZE TECHNOLOGY SOLUTIONS, LLC, | § | |
| | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CASE NO. 2:11-CV-419-JRG |
| | § | |
| STAPLES, INC., et al., | § | |
| | § | |
| *Defendants*. | § | |
| | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are Plaintiff Optimize Technology Solutions, LLC's Markman Brief (Dkt. No. 217), the response of Defendants Dillard's, Inc., drugstore.com, Inc., Staples, Inc., J.C. Penney Company, Inc., J.C. Penney Corporation, Inc., HSN, Inc., and Recreational Equipment, Inc. (collectively, "Defendants") (Dkt. No. 229), and Plaintiff's reply (Dkt. No. 235).

Further before the Court is supplemental briefing filed by Defendants (Dkt. No. 261) and Plaintiff (Dkt. No. 264) that the Court permitted regarding the means-plus-function limitations, discussed below.

The Court held a claim construction hearing on November 5, 2013.

**Table of Contents**

I. BACKGROUND ............................................................................................................. **4**

II. LEGAL PRINCIPLES ................................................................................................. **5**

III. CONSTRUCTION OF AGREED TERMS .................................................................. **9**

IV. CONSTRUCTION OF DISPUTED TERMS ............................................................ **10**

    A. "web content item(s)" ......................................................................................... 12

    B. "pre-customized web content item(s)" and "pre-selected web content" ............................. 15

    C. "pre-customized display" ..................................................................................... 21

    D. "based on said visitor preferences, to provide the same pre-customized files from a web site server computer cache to a plurality of visitors" .................................................... 22

    E. "presenting the same cached pre-selected web content associated with the determined selected category to each of the plurality of visitors" and "presenting the same cached pre-selected web content associated with the selected category to a plurality of visitors from cache" ........................................................................................................... 26

    F. "caching" and "cached" ....................................................................................... 28

    G. "displaying said same at least one pre-customized display to the second visitor [over the Internet], wherein said same at least one pre-customized display is not regenerated before displaying" and "displaying said same pre-customized display from cache onto a web page accessed by said second visitor without regenerating said same cached pre-customized display for said second visitor" ..................................................................... 33

    H. "analyzing a personalized data file of a second visitor and associating the second visitor with [the / a] same at least one pre-customized display" and "analyzing a personalized data file of the second visitor and, based on visitor preferences of said second visitor, associating said second visitor with a same pre-customized display displayed to a previous visitor" ............................................................................... 35

    I. "registering the labeled accessed content" ................................................................ 38

    J. "personalized data file," "data file for each of a plurality of visitors," "visitor['s] data file[s]," "visitor files," "data file for at least one visitor," "data files for visitors," and "visitor data file for a visitor" ............................................................................... 40

    K. "generated" and "generating" ............................................................................... 46

    L. "server computer(s)" and "server" ......................................................................... 49

    M. "storing the data file" and "storing the personalized data file" ..................................... 49

    N. "labeling content of the web site," "labeling the content of the web site," and "labeling content of a web site" ........................................................................................... 50

    O. "accumulating information regarding labeled content" ............................................... 52

P. "category" ..................................................................................................... 53

Q. "prioritizing the categories in the data file" ................................................... 54

R. "pre-customized files" ...................................................................................... 56

S. "displaying," "presenting," "provide," and "providing" ................................... 59

T. "personalizing a web site without dynamically generated web pages for each visitor" ..... 61

U. "display" (noun), "web content," "web page," "page component," and "web component" ................................................................................................... 62

V. "dynamically generated" ................................................................................... 63

W. "data file of the second visitor" ........................................................................ 65

X. "said computer memory of said website server computer," "a server computer," "the server computer comprises at least one of a plurality of server computers operating together to provide the web site," "when at least one visitor accesses the content of [the / said] web site," "said same at least one pre-customized display is a web component to be placed as a portion of a web page accessed by the second visitor," and Claims 20-25 as a Whole ................................................................................................... 66

Y. "determining, after [the / said] caching, a selected category associated with [each / a] visitor's interests" ............................................................................................. 72

Z. "second visitor" ................................................................................................. 73

AA. Means-Plus-Function Limitations ..................................................................... 74

(a) "means for labeling . . ." ............................................................................ 84

(b) "means for registering . . ." ....................................................................... 86

(c) "means for storing the data file for at least one visitor" ............................ 89

(d) "means for displaying . . ." ......................................................................... 89

(e) "means for generating . . ." ........................................................................ 92

(f) "means for caching . . ." ............................................................................. 95

(g) "means for analyzing . . ." ......................................................................... 97

(h) "computer readable program code means embodied in said medium for searching, said computer readable code means comprising;" ........................................ 101

**V. CONCLUSION** .................................................................................................. **102**

# I. BACKGROUND

Plaintiff brings suit alleging infringement of United States Patent No. 6,330,592 ("the

'592 Patent") (Dkt. No. 217, Ex. A). The '592 Patent is titled "Method, Memory, Product, and

Code for Displaying Pre-Customized Content Associated with Visitor Data." The '592 Patent

issued on December 11, 2001, and bears a filing date of December 5, 1998. The Abstract states:

> Visitor interests can be tracked by including "keyword directives" in content
> contained within the web site. These keyword directives specify a keyword
> indicating the type of category of information represented by the content. As the
> content is delivered to the visitor in the form of a web page, the number of
> keyword directives attached to the content is accumulated into a specified visitor
> profile. Over time, this visitor profile can represent the types of information the
> visitor has viewed and serve as an indicator of his or her preferences. In this way,
> the invention can accumulate a visitor profile unobtrusively, without requiring the
> visitors to fill out a survey or questionnaire. The profile may also be augmented
> with explicit information the visitor provides over time, such as a name or address
> provided when ordering a product from the site. The invention then delivers
> personalized pages to the visitor by examining such visitor's profile.

The Court construed various terms in the '592 Patent in *SBJ IP Holdings 1, LLC v.*

*Blockbuster Inc., et al.*, No. 2:09-CV-29, Dkt. No. 268, 2011 WL 903194 (E.D. Tex. Mar. 15,

2011) (Everingham, J.) ("*Blockbuster*").[1] The *Blockbuster* Plaintiff, SBJ IP Holdings 1, LLC, is

sometimes referred to herein as "SBJ." According to Defendants, "Plaintiff [in the above-

captioned case] was plaintiff in the prior [*Blockbuster*] action, and has since renamed itself

Optimize Technology Solutions, LLC." (Dkt. No. 229, at 2 n.2.)

After *Blockbuster*, the '592 Patent underwent *ex parte* reexamination at the United States

Patent and Trademark Office ("PTO"). A reexamination certificate, issued on December 18,

2012, amended various claims and also added new claims.

---

[1] Citations to page numbers in *Blockbuster* herein shall follow the page numbering of the slip
opinion.

## II. LEGAL PRINCIPLES

It is understood that "[a] claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using or selling the protected invention." *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999). Claim construction is clearly an issue of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

To ascertain the meaning of claims, courts look to three primary sources: the claims, the specification, and the prosecution history. *Markman*, 52 F.3d at 979. The specification must contain a written description of the invention that enables one of ordinary skill in the art to make and use the invention. *Id.* A patent's claims must be read in view of the specification, of which they are a part. *Id.* For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims. *Id.* "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

Nonetheless, it is the function of the claims, not the specification, to set forth the limits of the patentee's invention. Otherwise, there would be no need for claims. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc). The patentee is free to be his own lexicographer, but any special definition given to a word must be clearly set forth in the specification. *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1388 (Fed. Cir. 1992). Although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim

language is broader than the embodiments.  *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

This Court's claim construction analysis is substantially guided by the Federal Circuit's decision in *Phillips v. AWH Corporation*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc).  In *Phillips*, the court set forth several guideposts that courts should follow when construing claims.  In particular, the court reiterated that "the claims of a patent define the invention to which the patentee is entitled the right to exclude."  415 F.3d at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  To that end, the words used in a claim are generally given their ordinary and customary meaning.  *Id.*  The ordinary and customary meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."  *Id.* at 1313.  This principle of patent law flows naturally from the recognition that inventors are usually persons who are skilled in the field of the invention and that patents are addressed to, and intended to be read by, others skilled in the particular art.  *Id.*

Despite the importance of claim terms, *Phillips* made clear that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  *Id.*  Although the claims themselves may provide guidance as to the meaning of particular terms, those terms are part of "a fully integrated written instrument."  *Id.* at 1315 (quoting *Markman*, 52 F.3d at 978).  Thus, the *Phillips* court emphasized the specification as being the primary basis for construing the claims.  *Id.* at 1314-17.  As the Supreme Court stated long ago, "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and

meaning of the language employed in the claims." *Bates v. Coe*, 98 U.S. 31, 38 (1878). In

addressing the role of the specification, the *Phillips* court quoted with approval its earlier

observations from *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir.

1998):

> Ultimately, the interpretation to be given a term can only be determined and
> confirmed with a full understanding of what the inventors actually invented and
> intended to envelop with the claim. The construction that stays true to the claim
> language and most naturally aligns with the patent's description of the invention
> will be, in the end, the correct construction.

*Phillips*, 415 F.3d at 1316. Consequently, *Phillips* emphasized the important role the

specification plays in the claim construction process.

The prosecution history also continues to play an important role in claim interpretation.

Like the specification, the prosecution history helps to demonstrate how the inventor and the

PTO understood the patent. *Id.* at 1317. Because the file history, however, "represents an

ongoing negotiation between the PTO and the applicant," it may lack the clarity of the

specification and thus be less useful in claim construction proceedings. *Id.* Nevertheless, the

prosecution history is intrinsic evidence that is relevant to the determination of how the inventor

understood the invention and whether the inventor limited the invention during prosecution by

narrowing the scope of the claims. *Id.*; *see Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d

1340, 1350 (Fed. Cir. 2004) (noting that "a patentee's statements during prosecution, whether

relied on by the examiner or not, are relevant to claim interpretation").

*Phillips* rejected any claim construction approach that sacrificed the intrinsic record in

favor of extrinsic evidence, such as dictionary definitions or expert testimony. The *en banc* court

condemned the suggestion made by *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193

(Fed. Cir. 2002), that a court should discern the ordinary meaning of the claim terms (through

dictionaries or otherwise) before resorting to the specification for certain limited purposes.

*Phillips*, 415 F.3d at 1319-24.  According to *Phillips*, reliance on dictionary definitions at the expense of the specification had the effect of "focus[ing] the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." *Id.* at 1321.

*Phillips* emphasized that the patent system is based on the proposition that the claims cover only the invented subject matter. *Id.*

  *Phillips* does not preclude all uses of dictionaries in claim construction proceedings. Instead, the court assigned dictionaries a role subordinate to the intrinsic record.  In doing so, the court emphasized that claim construction issues are not resolved by any magic formula.  The court did not impose any particular sequence of steps for a court to follow when it considers disputed claim language. *Id.* at 1323-25.  Rather, *Phillips* held that a court must attach the appropriate weight to the intrinsic sources offered in support of a proposed claim construction, bearing in mind the general rule that the claims measure the scope of the patent grant.

  Indefiniteness is a "legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims." *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1376 (Fed. Cir. 2001) (citation omitted).  A finding of indefiniteness must overcome the statutory presumption of validity. *See* 35 U.S.C. § 282.  That is, the "standard [for finding indefiniteness] is met where an accused infringer shows by clear and convincing evidence that a skilled artisan could not discern the boundaries of the claim based on the claim language, the specification, and the prosecution history, as well as her knowledge of the relevant art area." *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249-50 (Fed. Cir. 2008).

    In determining whether that standard is met, i.e., whether the claims at issue are
    sufficiently precise to permit a potential competitor to determine whether or not
    he is infringing, we have not held that a claim is indefinite merely because it

poses a difficult issue of claim construction. We engage in claim construction every day, and cases frequently present close questions of claim construction on which expert witnesses, trial courts, and even the judges of this court may disagree. Under a broad concept of indefiniteness, all but the clearest claim construction issues could be regarded as giving rise to invalidating indefiniteness in the claims at issue. But we have not adopted that approach to the law of indefiniteness. We have not insisted that claims be plain on their face in order to avoid condemnation for indefiniteness; rather, what we have asked is that the claims be amenable to construction, however difficult that task may be. If a claim is insolubly ambiguous, and no narrowing construction can properly be adopted, we have held the claim indefinite. If the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds. . . . By finding claims indefinite only if reasonable efforts at claim construction prove futile, we accord respect to the statutory presumption of patent validity . . . and we protect the inventive contribution of patentees, even when the drafting of their patents has been less than ideal.

*Exxon*, 265 F.3d at 1375 (citations and internal quotation marks omitted).

In general, prior claim construction proceedings involving the same patents-in-suit are "entitled to reasoned deference under the broad principals of *stare decisis* and the goals articulated by the Supreme Court in *Markman*, even though *stare decisis* may not be applicable *per se*." *Maurice Mitchell Innovations, LP v. Intel Corp.*, No. 2:04-CV-450, 2006 WL 1751779, at *4 (E.D. Tex. June 21, 2006) (Davis, J.). The Court nonetheless conducts an independent evaluation during claim construction proceedings. *See, e.g., Texas Instruments, Inc. v. Linear Techs. Corp.*, 182 F. Supp. 2d 580, 589-90 (E.D. Tex. 2002); *Burns, Morris & Stewart Ltd. P'ship v. Masonite Int'l Corp.*, 401 F. Supp. 2d 692, 697 (E.D. Tex. 2005); *Negotiated Data Solutions, Inc. v. Apple, Inc.*, No. 2:11-CV-390, 2012 WL 6494240, at *5 (E.D. Tex. Dec. 13, 2012).

## III. CONSTRUCTION OF AGREED TERMS

The Court hereby adopts the following agreed constructions:

| Term | Agreed Construction |
|---|---|
| **"accumulating the number of accesses to each category"** (Claim 3) | **"totaling the number of accesses to content labeled with a particular category"** |
| **"a count of keywords"** (Claim 14) | **"the number of instances of a keyword in the visitor preference data"** |
| **"time of access"** (Claims 15 & 19) | **"how recently a visitor accessed the information"** |

(Dkt. No. 171, 8/19/2013 Joint Claim Construction and Prehearing Statement, Ex. A, at 2.)

## IV. CONSTRUCTION OF DISPUTED TERMS

As a preliminary matter, Defendants have argued in their responsive claim construction brief that various amendments made during reexamination resulted in substantive changes to several claims, thereby giving rise to intervening rights. (*See* Dkt. No. 229.) By presenting intervening rights arguments during these claim construction proceedings, Defendants evidently seek claim construction rulings on whether substantive changes occurred or, perhaps, rulings on the scope of the claims as they existed prior to the reexamination amendments and as they now stand after the reexamination amendments.

Plaintiff's position has not been clear or consistent. In some instances, Plaintiff has stated that "[t]he Federal Circuit has held that determining whether [35 U.S.C.] Section 252 [intervening rights] may apply requires courts to first interpret the scope of the claims as they existed pre-reexamination as well as the scope of claims post-reexamination by analyz[ing] the claims of the original and the reexamined patents in light of the particular facts, including the prior art, the prosecution history, other claims, and any other pertinent information." (Dkt. No. 136, Pl.'s Opp'n to Defs.' Mot. to Dismiss, at 7 (citations and internal quotation marks omitted); *see* Dkt. No. 152, Pl.'s Sur-Reply to Defs.' Mot. to Dismiss, at 2 (similar).)

In other instances, Plaintiff has suggested that before the Court considers Defendants' intervening rights arguments, the Court should construe the post-reexamination claims, *i.e.*, the Court should construe the claims in their amended form. (*See* Dkt. No. 135-1, 5/28/2013 Letter Brief, at 2; Dkt. No. 150-1, 6/10/2013 Letter Brief, at 3 ("[T]his work cannot be done without first determining the scope of the post-reexamination claims through a claim construction."); Dkt. No. 136, at 8 ("To determine the scope of the post-reexamination claims requires a claim construction."); *see* Dkt. No. 248, Exs. A & B, 10/25/2013 Joint Claim Construction Charts (Plaintiff proposing constructions for claim terms only as amended by the reexamination); *see id.*, Ex. B, at 1 n.1 (Defendants explaining that Plaintiff refused to include, in a single Joint Claim Construction Chart, Defendants' proposals that certain post-reexamination terms, phrases, or claims are substantively different from corresponding pre-reexamination terms, phrases, or claims).)

Defendants previously requested leave to file a motion for summary judgment on intervening rights. (*See* Dkt. No. 112.) After reviewing arguments from both sides (*see* Dkt. Nos. 112, 135, 138 & 150), the Court on June 24, 2013, ruled that "the request should be and is hereby DENIED without prejudice to re-filing after this Court issues its claim construction order." (Dkt. No. 155.)

Thus, the Court determined in its June 24, 2013 Order that intervening rights issues will not be addressed until after the present Memorandum Opinion and Order regarding claim construction has been entered. The volume of the claim construction arguments addressed in the present Memorandum Opinion and Order underscores the appropriateness of that determination. *See Adrain v. Vigilant Video, Inc.*, No. 2:10-CV-173, 2013 WL 1984369, at *2-*3 (E.D. Tex. May 13, 2013) (Gilstrap, J.) (Court addressed a motion for summary judgment regarding intervening

rights because Court had already construed the original claims *and* no party identified any terms in the reexamined claims as requiring additional construction). The Court accordingly advised the parties, shortly before the start of the November 5, 2013 hearing, that the present claim construction proceedings would only construe the claims as amended by the reexamination. The parties therefore did not, on November 5, 2013, present oral argument on Defendants' intervening rights arguments or on any claim construction arguments that pertain to only the original, pre-reexamination claims.

The present Memorandum Opinion and Order therefore construes the claims of the '592 Patent in their amended form only. Although the following analysis notes some of Defendants' arguments that reexamination amendments caused substantive changes in claim scope, the Court does not here construe the unamended claims or compare the scope of the amended and unamended claims.

## A. "web content item(s)"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "any item that can be accessed and viewed by a visitor, such as an entire web page, a component of a web page, an insertion into a web page or graphic link" | "Any item(s) that can be accessed and viewed by a visitor, such as an entire web page, a component of a web page, an insertion into a web page or a graphic link. A web content item is ready to render in a user's browser." |

(Dkt. No. 217, at 9.) This disputed term appears in Claims 2, 20, 22, and 24.

In *Blockbuster*, the parties agreed upon the construction of "web content item" that Plaintiff here proposes. *See Blockbuster* at 9.

(1) The Parties' Positions

Plaintiff submits that although the parties agree upon the construction reached in *Blockbuster*, the additional limitation proposed by Defendants "is neither supported by the specification nor clear as to its meaning." (Dkt. No. 217, at 10.)

Defendants respond that the specification discloses (in Defendants' words) that "a web content item must not only be something a user can view but also something that a browser can display." (Dkt. No. 229, at 18.) Further, Defendants cite an extrinsic technical dictionary definition of "HTML" (quoted below), which is a format commonly used for web pages.

Plaintiff replies that Defendants' proposed "ready to render" limitation "is unsupported and unclear." (Dkt. No. 235, at 14.) Plaintiff also argues that the extrinsic evidence cited by Defendants "misses the mark" because that evidence defines "ready to render," not "web content item." (*Id.*, at 13-14.)

(2) Analysis

The specification discloses an embodiment in which web content items are "preferably" defined through hypertext markup language ("HTML"), which is a common format for web pages that can be displayed by web browsers:

> *In the preferred embodiment*, the method is implemented on a web site server. When the web site is being developed, "Web Content Items" are created by the developers of the web site. Web Content Items can be an entire web page, a component of a web page, an insertion into a web page, a graphic link and/or any other items that can be accessed and viewed by a user. Often times a content item is a self-contained story or fragment of data; for example, the individual stories 221, 223, 225 are each a Web Content Item. Web Content Items can reside at more than one URL. The Web Content Items are *preferably* defined through a markup language, including, but not limited to, HTML.

('592 Patent at 5:27-39 (emphasis added).) "Web Content Items" are disclosed as being "viewed by the visitor." (*Id.* at 6:65.) The specification further discloses using a "browser" to "visually present" information received from remote server computers. (*Id.* at 4:21-26.)

Defendants have also submitted an extrinsic technical dictionary definition suggesting that content that is "ready to render" (as in Defendants' proposed construction) is formatted, such as in HTML, and is not in raw form such as data in a database:

The HTML description of a document page defines the placement of text and images on the page and also the HYPERTEXT links that lead visitors from this page to other pages on the web. When you go to a page on the web, what is actually received by your computer is HTML-coded text describing that page. The main function of a WEB BROWSER is to interpret these HTML descriptions and render them into text and graphics on a computer screen.

(Dkt. No. 229, Ex. J, *The New Penguin Dictionary of Computing* 231 (2001) (definition of "HTML").) "Because dictionaries, and especially technical dictionaries, endeavor to collect the accepted meanings of terms used in various fields of science and technology, those resources have been properly recognized as among the many tools that can assist the court in determining the meaning of particular terminology to those of skill in the art of the invention." *Phillips*, 415 F.3d at 1318. Nonetheless, "heavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification." *Id.* at 1321; *see id.* at 1322 ("A claim should not rise or fall based upon the preferences of a particular dictionary editor, or the court's independent decision, uninformed by the specification, to rely on one dictionary rather than another.").

On balance, neither the specification nor the extrinsic technical dictionary definition demands the additional limitation that Defendants have proposed, namely that "[a] web content item is ready to render in a user's browser." In addition to tending to confuse rather than clarify the scope of the claims, such a limitation is, at best, a feature of preferred embodiments that should not be imported into the claims. *See Electro Med.*, 34 F.3d at 1054; *see also Intervet Inc. v. Merial Ltd.*, 617 F.3d 1282, 1287 (Fed. Cir. 2010). Defendants' proposed "ready to render" limitation is therefore hereby expressly rejected.

The Court accordingly hereby construes **"web content item(s)"** to mean **"any item that can be accessed and viewed by a visitor, such as an entire web page, a component of a web page, an insertion into a web page, or a graphic link."**

**B. "pre-customized web content item(s)" and "pre-selected web content"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "pre-customized web content item(s)": <br> "web content item(s) having a predetermined association that can be used to enable the appearance of customization/ personalization for visitors" <br><br> "pre-selected web content": <br> Does not need to be construed/ independently construed.[2] | Staples Defendants:[3] <br> "web content items having an association with visitor preferences and interests that is established prior to a specific visitor visiting the web site, which controls what content will be shown to the visitor" <br><br> Defendant Recreational Equipment, Inc. ("REI"): <br> "predetermined web content items provided to the visitor based on information in a personalized data file" |

(Dkt. No. 217, at 10; Dkt No. 248, Ex. B, at 19.)  The first of these disputed terms appears in Claims 11 and 12.  The second appears in Claims 10 and 17.

Plaintiff proposes the construction for "pre-customized web content items" that the Court reached in *Blockbuster*.  *Blockbuster* at 16.  *Blockbuster* addressed "pre-selected web content" only as part of the "presenting cached pre-selected web content . . ." terms, addressed below.

(1)  The Parties' Positions

Plaintiff cites disclosure in the specification that (in Plaintiff's words) "a 'pre-customized web content item' is a web content item having a predetermined association that enables the

---

[2] At the November 5, 2013 hearing, Plaintiff cited the *Blockbuster* construction of the "presenting" step in Claims 10 and 17 and proposed that "pre-selected web content" should be construed to mean "pre-customized web content item associated with the selected category."

[3] Plaintiff has used the term "Staples Defendants" to refer to all Defendants other than Defendant Recreational Equipment, Inc. ("REI").  (Dkt. No. 217, at 10 n.8.)  Defendants also use this term for convenience.  (Dkt. No. 229, at 3 n.4.)

appearance of customization/personalization when presented to the web site visitor, rather than actually being personalized for that visitor when that visitor arrives at the web site." (Dkt. No. 217, at 12.) Plaintiff argues that Defendants' proposals "simply ignore this foundational aspect of the invention," specifically the "appearance of customization or personalization." (*Id.*, at 12.) As to the proposal by the Staples Defendants, Plaintiff responds:

> [Plaintiff] agrees that for the web content item(s) being shown to a visitor during a particular visit, the association(s) that led to the web content item(s) being shown to the visitor must have been created prior to the visitor arriving at the web site for that particular visit. However, the Staples Defendants' construction appears to require that all of the associations with any web content items that might ever, at any time in the future, be shown to a particular visitor be "established" prior to that visitor ever visiting the web site (in other words, no additional "associations" could be made for web content items after a visitor visits the web site the first time).

(Dkt. No. 217, at 13.) Plaintiff explains that "if all of the associations with web content items must be 'established' before the visitor ever visits the website, then the web site would not be able to develop new associations to present new pre-customized content to repeat visitors to the web site." (*Id.*)

The Staples Defendants respond that as stated in the reexamination prosecution history, as well as by Plaintiff in its opening brief, "pre" means before a particular visitor arrives at a web site and "customized" refers to associations that control what content will be shown to the visitor based on visitor preferences/interests. (Dkt. No. 229, at 4.) Defendants also note that "both sides' constructions state that *an* association is established in advance, not that *all* associations are so established." (*Id.*, at 4 n.6.)

Defendant REI responds that "Plaintiff's construction will confuse the jury if Plaintiff remains free to argue that pre-customized content can be provided to a visitor based on associations generated previously by a webmaster, but without reference to that specific visitor's

data file." (*Id.*, at 6.) At the November 5, 2013 hearing, REI argued that Plaintiff's proposal would exclude the embodiment shown in Figure 2, which illustrates a web page that includes the name of a particular visitor.

Plaintiff replies that "[t]he patent is clear that the 'pre-customized' content is not actually personalized but, instead, is seemingly personalized to provide the appearance of customization." (Dkt. No. 235, at 8 (citing '592 Patent at 2:45-60, 3:13-23, 6:6-9 & 6:60-7:10).) Plaintiff argues that "Defendants' proposed constructions cover content that is actually customized for a particular visitor." (Dkt. No. 235, at 8 (footnote omitted).) Plaintiff further argues that the Staples Defendants' proposal of the phrase "having an association with visitor preferences and interests" is redundant because other claim language recites that limitation. (Dkt. No. 235, at 9.)

At the November 5, 2013 hearing, Plaintiff further urged that the claims encompass pre-customizing all web content in advance as well as, alternatively, customizing web content for a particular visitor and then retrieving that content from cache for subsequent visitors with similar interests.

(2)  Analysis

As a threshold matter, Defendants have persuasively argued that "pre-customized web content item(s)" and "pre-selected web content" should be given the same construction. (*See* Dkt. No 229, Ex. D, 8/12/2011 Reply to Notice of Defective Paper, at 35 (p. 18 of 20 of Ex. D) (patentee used both "pre-selected content" and "pre-customized web content items" to refer to the same limitation).)

As to the meaning of "pre-customized," *Blockbuster* "agree[d] with [Plaintiff's] contention that 'pre-customized,' as used in the '592 Patent, requires only the appearance of customization/personalization." *Blockbuster* at 14. The Court also "reject[ed] [the defendant's]

17

argument that 'pre-customized' items must have been previously assembled for another visitor."

*Id.* The Court hereby adopts these findings from *Blockbuster*, as set forth herein.

The Summary of the Invention discusses delivering a "personalized" page in which some or all of the page is "recycled" from what has been presented to other visitors:

> For example, a visitor may demonstrate interest in football and, in particular, his favorite football team. The present invention learns this by observing the behavior of the visitor, i.e., which sports articles he reads and if such articles are focused even further. If a tendency is observed, the learned knowledge is then used to deliver more information about that team to the visitor. Such preferred articles can be recycled by having the invention deliver the same information to other visitors who have the same favorite team.

> * * *

> The present invention then delivers personalized pages to the visitor by examining such visitor's profile. Another directive, called a personalization directive, may be placed into web pages that are to be customized by the invention. These directives cause a personalization function to be applied to the visitor's profile data. The result of the personalization function defines an attribute to be used for locating personalized page fragments, called 'page components', that the invention then assembles into a customized page for the visitor. In this manner, each visitor may receive a page containing three different classes of data: common data received by all visitors, personalized data received by a similar group of visitors, and individual data received only by this one visitor. The present invention assembles all of this data and delivers a 'personalized' page to the visitor.

> * * *

> For example, a home page for a large web site might include a personalization directive describing the inclusion of an article related to a visitor's favorite NFL team. The personalization directive function examines the visitor profile, determines the favorite team, and includes the appropriate page with information about that team. In this way, each visitor to the web site might receive a different introductory web page, customized for their preferences. Even though every visitor receives a page that appears to be customized for them, since, in fact, there are only 30 or so NFL teams; the caching mechanism of the invention ensures that the dynamic page generation only occurs at most 30 or so times. If one million visitors come to the site, most of the visitors simply receive a web page that was already dynamically generated for a previous visitor. In essence, the invention allows "personalized" pages to be constructed by choosing from a set of

previously computed pages, rather than by dynamically computing each page for every visitor.

('592 Patent at 2:22-29, 2:45-60 & 3:6-23.)  The specification similarly discloses:

> [In the example of Fig. 2,] [t]he next line 244 shows an example of the results of a personalization directive.  The information on the page has been customized to reflect the fact that this visitor, preferably based on prior visits, has demonstrated interest in the Round Rock Rocker's football team; therefore, a custom hyperlink 244 has been added to the page to provide the visitor with a quick way of obtaining more information about their favorite team.
>
> * * *
>
> In the preferred embodiment the developer can then assign at least one category and/or a keyword to each of the Web Content Items.  These categories and key words are used to determine visitor interest when they access Web Content Items on a Web Site.
>
> In such a preferred embodiment, the developer thereby defines all the categories that can be used within the system.  The categories might be broad definitions and/or include keywords.  The developer can then devise a set of Web Content Items that can 'personalize' the Web Site for the visitor the next time the visitor accesses the web site.  This personalization can be done according to the accumulated data in the visitor's file, gathered implicitly by observing which Web Content Items, and therefore which categories have been of interest to the visitor in the past.  *The 'personalization' will not be a one-time dynamically generated customized web page, which would be too resource intensive and therefore slow, but will be based on predetermined Web Content Items that are developed and then cached into memory.*

(*Id.* at 5:40-59 (emphasis added).)

> When a visitor accesses a web site that has an existing file for that visitor, the program determines from the file and the tallied categories, which pre-customized content, i.e., the personalized page components, to provide to the visitor.
>
> * * *
>
> The present invention gives the visitor the impression of a customized page visitor [*sic*] when in actuality it presents pre-customized pages and/or page components that have been cached.

(*Id.* at 6:6-17; *see id.* at 6:60-7:10 (similar); *see also id.* at 6:37-42 ("Assuming that visitor A in prior visits has frequented a number of Web Content Items with a keyword of 'football', then when visitor A returns to the web site a page with personalized page components will appear where the page components (e.g., 221, 223, 225) are Web Content Items comprising football-related stories."); *id.* at 5:49-55 (similar).)

During reexamination, Plaintiff stated that "[t]he web content items are pre-customized because the web site establishes, *in advance of a visitor visiting the web site*, associations that control what content will be shown to the visitor *based on visitor preferences/interests*." (Dkt. No. 229, Ex. C, 6/16/2011 Reply to Office Action, at 15 (emphasis added).) Plaintiff has expressed a similar understanding in its opening claim construction brief in the above-captioned case: "This predetermined *association between the interest/preference data and the web content item(s)* being shown to the visitor during that particular visit was *developed before the visitor arrived* at the web site (thus the 'pre' in 'pre-customized')." (Dkt. No. 217, at 11 (emphasis added).)

As found in *Blockbuster*, however, the disputed term encompasses the mere "appearance" of customization. *Blockbuster* at 14. This comports with the above-quoted passages from the specification and the prosecution history because "associations" are distinct from visitor profiles. (Dkt. No. 229, Ex. C, 6/16/2011 Reply to Office Action, at 15 (quoted above).) Associations are used in conjunction with a visitor's profile to create an *appearance* of customization for that particular visitor even though the same content may be served to many visitors. (*See, e.g.,* '592 Patent at 3:6-23 (quoted above).)

Also, although the Court adopts Plaintiff's proposal of the phrase "predetermined" rather than Defendants' proposal of "established prior to a specific visitor visiting the web site," the Court is relying upon Plaintiff's explanation in its briefing that "for the web content item(s)

being shown to a visitor during a particular visit, the association(s) that led to the web content

item(s) being shown to the visitor must have been created prior to the visitor arriving at the web

site for that particular visit."  (Dkt. No. 217, at 13.)

Finally, although Defendants criticize Plaintiff's proposal for failing to refer to visitor

data, that limitation is recited by other claim language and need not be duplicated in the

construction of "pre-customized web content item(s)."

The Court therefore hereby construes **"pre-customized web content item(s)"** and **"pre-**

**selected web content"** to mean **"web content item(s) having a predetermined association**

**that can be used to enable the appearance of customization/personalization for visitors."**

## C.  "pre-customized display"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "web content item(s) having a predetermined association that can be used to enable the appearance of customization/personalization for visitors, which is displayed to a visitor" | Staples Defendants:<br>    "display(s) having an association with visitor preferences and interests that is established prior to a specific visitor visiting the web site, which controls what content will be shown to the visitor"<br><br>Defendant REI:<br>    "predetermined display provided to the visitor based on information in a personalized data file" |

(Dkt. No. 217, at 14-15.)  This disputed term appears in Claims 1, 4, 7, 9, 16, 20, and 25.

Plaintiff proposes the construction that the Court reached in *Blockbuster*.  *Blockbuster*

at 20.  The parties' arguments for this disputed term are substantially the same as their arguments

for "pre-customized web content item(s)," discussed above.  (Dkt. No. 217, at 15; *see* Dkt. No.

229, at 3-7.)  The Court likewise reaches the same conclusions.

The Court therefore hereby construes **"pre-customized display"** to mean **"web content item(s) having a predetermined association that can be used to enable the appearance of customization/personalization for visitors, which is displayed to a visitor."**

**D. "based on said visitor preferences, to provide the same pre-customized files from a web site server computer cache to a plurality of visitors"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| "for each plurality of visitors, identifying at least one pre-customized web content item based on the visitor's preferences and displaying the pre-customized web content item to the visitor from a file in cache so that the at least one pre-customized web content item has the appearance of customization/ personalization to the visitor"[4] | "based on said visitor preferences, to display the actual cached pre-customized files from a web site server computer cache to a plurality of visitors, and without having to resort to source data"<br><br>This term is substantively different than the corresponding term that existed in the claim prior to reexamination, "based on said visitor preferences, to provide pre-customized files to visitor." |

(Dkt. No. 248, Ex. B, at 20.)  This disputed term appears in Claim 11.

*Blockbuster* construed the term "based on said visitor preferences, to provide pre-customized files to visitor" to mean "identifying at least one pre-customized web content item based on the visitor's preferences and displaying the pre-customized web content item to the visitor from a file in cache so that the at least one pre-customized web content item has the appearance of customization/personalization to the visitor."  *Blockbuster* at 23-24.

---

[4] Plaintiff proposed in its opening brief: "for each *of a* plurality of visitors, identifying at least one pre-customized web content item based on the visitor preferences and displaying the pre-customized web content item to the visitor from a file in cache so that the at least one pre-customized web content item has the appearance of customization/personalization to the visitor." (Dkt. No. 217, at 15 (emphasis added).)

Plaintiff argues that Defendants' proposals of "actual cached" and "without having to resort to source data" are redundant and confusing in light of the agreed-upon requirement of a cache, which appears in both sides' proposed constructions.  (Dkt. No. 217, at 17.)  Plaintiff also argues that the constituent term "pre-customized files" can be given meaning and is supported by the specification.  (*Id.*, at 16.)

Defendants respond that "[c]onsistent with th[e] addition of 'the same' and 'said same' [by amendment during reexamination,] Defendants' constructions require displaying the actual content displayed to different visitors, while Plaintiff attempts to amend the claims back to their original versions with constructions that delete 'the same' and 'said same' from the claims."  (Dkt. No. 229, at 12.)  Defendants urge that their "inclusion of 'without having to resort to source data' in their constructions is necessary to ensure that the pre-customized content is not regenerated for each user dynamically, but rather is served up to subsequent users from the cache just as it was presented to a first user."  (*Id.*, at 13.)  Defendants further argue that Plaintiff's proposed construction is confusing because "there is absolutely nothing in . . . the[] claim[] regarding 'at least one' pre-customized web content item."  (*Id.*, at 14.)

Defendants also respond that the reexamination amendments substantively changed the scope of the claims by requiring providing information either to a second visitor or to a plurality of visitors.  (*Id.*, at 14.)  Defendants submit that, in *Blockbuster*, the Court agreed with Plaintiff that the original claims at issue did not require multiple visitors or displaying the same content to a first visitor and then a second visitor.  (*Id.*, at 14-15 (citing *id.*, Ex. O, 12/15/2010 Hr'g Tr. at 26:8-13; citing Dkt. No. 217, Ex. E, 10/22/2010 SBJ Markman Br., at 7; citing *Blockbuster* at 15 ("In claims 11, 12, and 16 . . . there is no mention of multiple visitors.").  Defendants further

argue that during reexamination, Plaintiff distinguished prior art references that "did not provide the same cached pre-customized web content items to multiple web site visitors." (Dkt. No. 229, at 15-16 (quoting *id.*, Ex. G, 9/15/2012 Reply to Final Office Action, at 8).) Plaintiff explained that after amendment, "[e]ach of these claims includes the feature that the same cached pre-customized content is provided to multiple users based on reviewing the visitor data for the visitors." (Dkt. No. 229, at 16 (quoting *id.*, Ex. G, 9/15/2012 Reply to Final Office Action, at 25).)

Plaintiff replies that it "has consistently taken the position that the independent claims require[] showing the same pre-customized content to multiple visitors." (Dkt. No. 235, at 3.) As to *Blockbuster*, Plaintiff replies:

> The Court understood that [the *Blockbuster* defendant's] proposed construction requiring the pre-customized content to be previously assembled for another visitor would [have] introduce[d] a specific kind of additional visitor to those claims that is not required by either the specification or the claim language itself, namely, a previous visitor (to the one recited in the claims) for whom pre-customized content was previously assembled prior to the visitor actually recited in the claim arriving at the web site. And, this remains true post-Reexamination – no such previous visitor for whom the content was previously assembled is required under independent Claims 10, 11, 16 and 17.

(Dkt. No. 235, at 3-4 (citing Dkt. No. 217, Ex. E, 10/22/2010 SBJ Markman Br., at 20) (emphasis omitted); *see* Dkt. No. 229, Ex. O, 12/15/2010 Hr'g Tr. at 11:4-14 (Plaintiff stated that another visitor clicking on a link at the same time may receive the same content).) Plaintiff further argues that "[i]f, on the other hand, the same web content is only shown to a single visitor, then it would not 'appear' customized to that visitor, but would be *actually* customized for that visitor (*i.e.*, it was personalized for, and personal to, just that one visitor)." (Dkt. No. 235, at 4-5.) Plaintiff concludes that "'pre-customized' content can be assembled for the 'visitor' recited in Claims 10, 11, 16 and 17 for the first time and shown to that visitor (without being previously

assembled for another visitor); but, in order to be 'pre-customized' (and, therefore, have the *appearance* of customization), that *same* pre-customized content must be shown to more than one visitor." (*Id.*, at 5.)

(2)  Analysis

The specification discloses that information about an interest of a visitor can be used to select pre-customized content that is appropriate for visitors with that interest:

> If a visitor file exists for the current visitor, *the program accesses such visitor file to determine the visitor's interests* as determined by the keywords associated with prior Web Content Items served, and, in one embodiment, there may be a weighing factor or other algorithmic determination for the additional Web Content Items viewed by the visitor during the most recent usage.  *The program then selects a pre-customized page or pre-customized page components which should reflect this interest.*  These selections can be assembled by a component assembler 340, and may be further subject to personal modification by a monogrammer 330 to make changes such as inserting the visitor's name onto the page.

(*Id.* at 6:60-7:11 (emphasis added).)

During reexamination, Plaintiff distinguished prior art that "would not provide the second user with the same . . . information content from cache that was provided to a previous user." (Dkt. No. 229, Ex. G, 9/15/2012 Reply to Final Office Action, at 26.)  This statement should be given effect in the Court's construction.  *See Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1381 (Fed. Cir. 2011) ("The patentee is bound by representations made and actions that were taken in order to obtain the patent.").

Plaintiff's proposed construction, by contrast, fails to explain that the *same* files are provided to *multiple* visitors.  Also, Plaintiff's proposal to refer to the "appearance of customization/personalization" is redundant with Plaintiff's proposal for "pre-customized web

content item(s)."  Likewise, Defendants' proposal of "without having to resort to source data" is redundant with both sides' proposal of using a cache.

The Court therefore hereby construes **"based on said visitor preferences, to provide the same pre-customized files from a web site server computer cache to a plurality of visitors"** to mean **"using the preferences of multiple visitors to display a same pre-customized web content item to those multiple visitors from a file in a web site server computer cache."**

**E. "presenting the same cached pre-selected web content associated with the determined selected category to each of the plurality of visitors" and "presenting the same cached pre-selected web content associated with the selected category to a plurality of visitors from cache"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "for each of [the / a] plurality of visitors, identifying at least one pre-customized web content item associated with the selected category, and displaying the at least one pre-customized web content item from cache, where the at least one pre-customized web content item has the appearance of customization/personalization to the visitor" | "displaying the actual cached pre-selected web content associated with the determined selected category to each of the plurality of visitors, and without having to resort to source data"<br><br>This term is substantively different than the corresponding term that existed in the claim prior to reexamination, "presenting cached pre-selected web content to the visitor." |

(Dkt. No. 217, at 17-18; Dkt. No. 248, Ex. A, at 15.)  The first of these disputed terms appears in Claim 10.  The second appears in Claim 17.

*Blockbuster* construed "presenting cached pre-selected web content to the visitor, wherein such pre-selected web content is associated with the selected category" to mean "identifying at least one pre-customized web content item associated with the selected category, and displaying the at least one pre-customized web content item from cache, where the at least

one pre-customized web content item has the appearance of customization/personalization to the visitor." *Blockbuster* at 24-25.

Plaintiff argues that Defendants' proposed construction should be rejected for the same reasons as discussed regarding the "pre-customized" terms, above. Defendants likewise present the same arguments for these terms as for the "based on said visitor preferences, to provide . . ." term, discussed above. (*See* Dkt. No. 229, at 12-16.) The Court thus similarly finds that Defendants' proposals of "actual" and "without having to resort to source data" are redundant with the present disputed terms' recital of "cached" web content. "Cached," in turn, has been presented as a distinct disputed term and is addressed separately in this Memorandum Opinion and Order.

Defendants' proposed construction is therefore hereby expressly rejected. No further construction of the present disputed terms is necessary. *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy."); *see also O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims."); *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010) ("Unlike *O2 Micro*, where the court failed to resolve the parties' quarrel, the district court rejected Defendants' construction.").

The Court accordingly hereby construes **"presenting the same cached pre-selected web content associated with the determined selected category to each of the plurality of visitors"**

and **"presenting the same cached pre-selected web content associated with the selected category to a plurality of visitors from cache"** to have their **plain meaning**.

**F. "caching" and "cached"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "storing information in a manner to provide for faster access in the future" | "storing web content such that future delivery of the web content can be achieved without dynamically generating that portion of the web page that contains the web content"<br><br>The phrase "caching" appearing in at least claims 10 and 17 is substantively different than any corresponding phrase that existed in the claims prior to reexamination. |

(Dkt. No. 217, at 18-19.)  These disputed terms appear in Claims 1, 10, 16, and 17.

Plaintiff proposes the construction that the Court reached in *Blockbuster*.  *Blockbuster* at 29.

(1)  The Parties' Positions

Plaintiff argues that whereas the specification defines "caching" in terms of speed of access, Defendants' proposed construction "do[es] not differentiate a 'cache' from any other manner of storing data."  (Dkt. No. 217, at 19.)

Defendants respond by citing passages from the specification, the original prosecution, and the reexamination in which the patentee stated that cached content is not dynamically regenerated.  (Dkt. No. 229, at 7-9.)  As to Plaintiff's argument that the specification describes caching in terms of speed, Defendants respond that the increase in access speed is a result of avoiding the need for dynamic regeneration, as noted in the specification.  (*Id.*, at 9.)  Defendants also argue that *Blockbuster* is unpersuasive because after *Blockbuster*, Plaintiff "further refined the definition of 'caching' and 'cached' during the subsequent reexamination."  (*Id.*, at 10.)

Finally, Defendants submit that Plaintiff's proposed construction is overbroad because "its definition would cover storing information in a chest at the bottom of the ocean because that is a 'manner' of storage that provides 'faster access' than burying information under the ocean floor." (*Id.*)

Plaintiff replies that although the ability to retrieve an item from cache without recreating the item is "axiomatic," "that requirement alone does not differentiate a 'cache' from any other type of storage." (Dkt. No. 235, at 10.) Plaintiff also submits that "Defendant's proposed construction of 'cache' does not require the 'web content' not be dynamically generated; rather, Defendants propose that the 'portion of the web page that contains the web content' (whatever that is) be delivered without being dynamically generated." (*Id.*, at 12 (footnote omitted).) Finally, Plaintiff argues that Defendants' proposal of "without dynamically generating that portion of the web page that contains the web content" lacks support because neither the specification nor the prosecution history refers to a "portion" of a web page in such a manner. (*Id.*, at 11.)

(2)  Analysis

The Summary of the Invention demonstrates that using a "cache" is different from dynamically generating something each time it is needed:

> The present invention stores personalized page components in a cache. Subsequent delivery of the same page components is satisfied by *retrieving the information from the cache, rather than by dynamically generating it each time*. The present invention can therefore take advantage of a common situation where large groups of visitors share similar interests and should receive the same data. Since previously generated *personalized page components need not be re-generated for every visitor*, computational overhead is reduced tremendously by supplying such pre-generated page components.

('592 Patent at 2:62-3:5 (emphasis added).)

The specification similarly contrasts dynamic replication with the use of a cache, noting that faster access is a benefit:

> The benefits of the present invention are immediately evident. The present invention gives the visitor the impression of a customized page visitor [*sic*] when in actuality it presents pre-customized pages and/or page components that have been *cached*. The system thereby conserves computing resources and retains a *higher access speed* on a server *as opposed to those systems that dynamically generate customized pages for each visitor*.

(*Id.* at 6:13-20 (emphasis added); *see id.* at 5:55-60 ("The 'personalization will not be a one-time dynamically generated customized web page, which would be too resource intensive and therefore slow, but will be based on predetermined Web Content Items that are developed and then *cached* into memory.") (emphasis added).)

During original prosecution, the patentee similarly stated: "The pre-customized displays are generated and cached on the server side. . . . *Compare this to the conventional technology, where the display may be regenerated each time the information is requested.*" (Dkt. No. 229, Ex. E, 1/12/2001 Reply to Office Action, at 4 (emphasis added); *see also id.*, Ex. F, 5/3/2001 Reply to Final Office Action, at 2 ("The caching helps to reduce the number of times a server needs to regenerate a pre-customized display. Therefore, embodiments of the present invention help to conserve the limited resources of the server computer.").)

During reexamination, which occurred after the *Blockbuster* claim construction ruling, Plaintiff stated:

> The web site can provide the pre-customized display to the second visitor *without regenerating* the pre-customized display because the pre-customized display is in *cache*.
>
> The second visitor *quickly* receives information that appears customized/ personalized to the second visitor (because of the pre-customized display provided to the second visitor based on of [*sic*] the visitor's profile) when, in fact,

the same pre-customized display is used to provide seemingly customized/
personalized information for multiple visitors (e.g., the first visitor).

(Dkt. No. 229, Ex. C, 6/16/2011 Reply to Office Action, at 28 (emphasis added); *see also id.*,

Ex. G, 9/15/2012 Reply to Final Office Action, at 14 ("The same pre-customized content

provided to a first visitor can be provided to a second visitor *from cache* based on analyzing the

second visitor's file *without regenerating* the pre-customized content for the second visitor.")

(emphasis added).)

Finally, as to extrinsic evidence, Defendants have cited technical literature that states: "It

is often possible to *cache* frequently accessed dynamic pages so that they *don't have to be*

*regenerated* by a server program every time they are requested."  (Dkt. No. 229, Ex. H, Iyengar,

MacNair & Nguyen, *An Analysis of Web Server Performance* 1946 (1997) (emphasis added); *see*

*also id.*, Ex. I, Iyengar & Challenger, *Improving Web Server Performance by Caching Dynamic*

*Data* JTDEF0000930 (1997) ("subsequent requests for the same dynamic page can access the

page from the cache instead of repeatedly invoking a program to generate the same page").)

On balance, this great weight of evidence, including the above-quoted explanation by the

patentee during the reexamination proceedings that occurred after *Blockbuster*, demonstrates that

an essential feature of "cached" web content is that it need not be dynamically generated.  This

evidence should be given effect in the Court's constructions.  *See Typhoon Touch*, 659 F.3d at

1381 ("The patentee is bound by representations made and actions that were taken in order to

obtain the patent."); *see also Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296,

1305 (Fed. Cir. 2011) ("In reviewing the intrinsic record to construe the claims, we strive to

capture the scope of the actual invention, rather than strictly limit the scope of claims to

disclosed embodiments or allow the claim language to become divorced from what the

specification conveys is the invention."); *Nystrom v. TREX Co., Inc.*, 424 F.3d 1136, 1144-45 (Fed. Cir. 2005) (construing term "board" to mean "wood cut from a log" in light of the patentee's consistent usage of the term; noting that patentee "is not entitled to a claim construction divorced from the context of the written description and prosecution history"); *Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1333 (Fed. Cir. 2011) ("[T]he consistent reference throughout the specification to the 'eccentric weight portion' as structure extending from the face of the gear makes it apparent that it relates to the invention as a whole, not just the preferred embodiment.").

The Court accordingly hereby construes **"caching"** to mean **"storing web content such that it can be delivered in the future without dynamic generation."**

The Court similarly hereby construes **"cached"** to mean **"stored such that web content can be delivered in the future without dynamic generation."**

**G. "displaying said same at least one pre-customized display to the second visitor [over the Internet], wherein said same at least one pre-customized display is not regenerated before displaying" and "displaying said same pre-customized display from cache onto a web page accessed by said second visitor without regenerating said same cached pre-customized display for said second visitor"**

| Plaintiff's Proposal | Defendants' Proposed Construction |
|---|---|
| "showing the at least one pre-customized display to the second visitor (over the Internet) wherein the previously generated pre-customized display is loaded from a cache and not dynamically recreated before showing" | Claims 1 and 25:<br>    "displaying the actual cached at least one pre-customized display to the second visitor that was displayed to a first visitor, wherein the actual cached pre-customized display is not regenerated before displaying, and without having to resort to source data"<br>    As to Claim 1: This term is substantively different than the corresponding term that existed in the claim prior to reexamination, "displaying the at least one pre-customized display to the second visitor, wherein the at least one pre-customized display is not regenerated before displaying."<br><br>Claim 16:<br>    "displaying the actual cached pre-customized display onto a web page accessed by a second visitor without regenerating the actual cached pre-customized display for said second visitor"<br>    This term is substantively different than the corresponding term that existed in the claim prior to reexamination, "displaying the pre-customized display onto a web page accessed by the visitor." |

(Dkt. No. 217, at 20; Dkt. No. 248, Ex. B, at 9-10.)  The first of these disputed terms appears in Claims 1 and 25.  The second appears in Claim 16.

In *Blockbuster*, the parties agreed to construe "displaying the at least one precustomized display to the second visitor, wherein the at least one precustomized display is not regenerated before displaying" to mean "showing the at least one 'precustomized display' to the 'second visitor' wherein the previously generated 'precustomized display' is loaded from a cache and not dynamically recreated before showing."  *See Blockbuster* at 9.

Plaintiff argues that Defendants' proposed constructions should be rejected for the same reasons discussed above as to the "caching" terms.  (Dkt. No. 217, at 21.)  Defendants likewise

present the same arguments for this term as for the "based on said visitor preferences, to provide . . ." term discussed above. (*See* Dkt. No. 229, at 12-16.) Plaintiff replies that Defendants' proposal of "without having to resort to source data" is "redundant and therefore unnecessary" and also lacks support in any of the evidence. (Dkt. No. 258, at 13.)

The Court reaches the same conclusions here as for the "caching," "cached," and "based on said visitor preferences, to provide . . ." terms discussed above. Finally, although the parties in *Blockbuster* agreed to interpret the constituent term "displaying" to mean "showing," Defendants in the above-captioned case have presented "displaying" as a distinct disputed term. "Displaying" is therefore addressed separately in this Memorandum Opinion and Order rather than within the constructions of the "displaying said same. . ." terms here.

The Court accordingly hereby construes the disputed terms as set forth in the following chart:

| Term | Construction |
|---|---|
| **"displaying said same at least one pre-customized display to the second visitor, wherein said same at least one pre-customized display is not regenerated before displaying"** (Claim 1) | **"displaying the at least one pre-customized display to the second visitor, wherein the previously generated pre-customized display is loaded from a cache instead of being dynamically regenerated"** |
| **"displaying said same pre-customized display from cache onto a web page accessed by said second visitor without regenerating said same cached pre-customized display for said second visitor"** (Claim 16) | **"displaying the pre-customized display to the second visitor, wherein the previously generated pre-customized display is loaded from a cache instead of being dynamically regenerated"** |
| **"displaying said same at least one pre-customized display to the second visitor over the Internet, wherein said same at least one pre-customized display is not regenerated before displaying"** (Claim 25) | **"displaying the at least one pre-customized display to the second visitor over the Internet, wherein the previously generated pre-customized display is loaded from a cache instead of being dynamically regenerated"** |

**H. "analyzing a personalized data file of a second visitor and associating the second visitor with [the / a] same at least one pre-customized display" and "analyzing a personalized data file of the second visitor and, based on visitor preferences of said second visitor, associating said second visitor with a same pre-customized display displayed to a previous visitor"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Claims 1:<br><br>    "identifying the at least one pre-customized display based on a review of information in the personalized data file of the second visitor"<br><br>Claim 16:<br><br>    "identifying at least one pre-customized display based on a review of information in a personalized data file of the second visitor, wherein the at least one pre-customized display was displayed to a previous visitor"<br><br>Claim 25:<br><br>    "identifying the at least one pre-customized display based on a review of information in the data file of the second visitor" | "identifying the actual at least one pre-customized display displayed to a previous visitor based on a review of information in a personalized data file of the second visitor"<br><br>As to Claim 1:<br><br>    This term is substantively different than the corresponding term that existed in the claim prior to reexamination, "analyzing the data file of a second visitor and associating the second visitor with the at least one pre-customized display."<br><br>As to Claim 16:<br><br>    This term is substantively different than the corresponding term that existed in the claim prior to reexamination, "analyzing the data file of the visitor and associating the user with a pre-customized display." |

(Dkt. No. 171, Ex. B, at 5-6; Dkt. No. 248, Ex. B, at 7-8.) The first of these disputed terms appears in Claims 1 and 25. The second appears in Claim 16.

*Blockbuster* construed "analyzing the data file of a second visitor and associating the second visitor with the at least one pre-customized display" to mean "identifying the at least one pre-customized display based on a review of information in the data file of the second visitor." *Blockbuster* at 36.

Plaintiff argues that "Claims 1 and 25 simply do not include the language 'displayed to a previous visitor' in this claim term; and, therefore, Defendants' addition of that language into Claims 1 and 25 is improper."  (Dkt. No. 217, at 22.)

Defendants respond that their proposed constructions "acknowledge the claims' uses of the word 'same' and properly reflect the explicit requirement that the 'displays' that are associated with a second visitor are the actual displays previously displayed to a first visitor." (Dkt. No. 229, at 17.)  Defendants argue that "Plaintiff's construction on the other hand seeks to recapture what it surrendered during reexamination, namely associating a second user with pre-customized content that is not the same as that displayed to a previous visitor, or which is the same only coincidentally."  (*Id.*)  Defendants further note that whereas Plaintiff's proposals refer to "the" data file of the second visitor, the claims recite "a" data file of the second visitor.  (*Id.*) Finally, Defendants argue that the reexamination amendments changed the scope of the claims by adding a "second visitor" to Claim 16 and by reciting "a" data file of the second visitor rather than "the" data file.  (*Id.*)

(2)  Analysis

Claim 1 is representative and recites (emphasis added; reproduced in amended form without indicating the amendments):

1.  A method of customizing a web site, said method comprising:
labeling content of the web site;
when at least one visitor accesses the content of the web site, registering the labeled accessed content in a personalized data file;
storing the data file for the at least one visitor;
*generating at least one pre-customized display for a first visitor*;
caching the at least one pre-customized displays [*sic*] on a server computer;
*displaying the at least one pre-customized display to the first visitor*;

analyzing a personalized data file of a second visitor and associating the second visitor with *the same at least one pre-customized display*, wherein said analyzing the personalized data file of the second visitor is performed after said generating; and

displaying said same at least one pre-customized display to the second visitor, wherein said same at least one pre-customized display is not regenerated before displaying said same at least one pre-customized display to the second visitor.

The claim language thus demonstrates that the disputed term refers to a display that has been displayed to a previous visitor. Claims 16 and 25 are similar. The specification is also consistent with such an interpretation:

If one million visitors come to the site, most of the visitors simply receive a web page that was already dynamically generated for a previous visitor. In essence, the invention allows "personalized" pages to be constructed by *choosing from a set of previously computed pages*, rather than by dynamically computing each page for every visitor.

(*Id.* at 3:18-23 (emphasis added); *see id.* at 2:57-58 ("personalized data received by a similar group of visitors").)

The Court therefore hereby construes **"analyzing a personalized data file of a second visitor and associating the second visitor with [the / a] same at least one pre-customized display"** and **"analyzing a personalized data file of the second visitor and, based on visitor preferences of said second visitor, associating said second visitor with a same pre-customized display displayed to a previous visitor"** to mean **"based on a review of information in a personalized data file of a second visitor, identifying a pre-customized display displayed to a previous visitor."**

## I. "registering the labeled accessed content"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "accumulating, creating[,] and/or updating a personalized data file with information reflecting that a visitor has accessed or viewed the labeled content" | "registering the representative categories belonging to the web page" |

(Dkt. No. 217, at 22-23; Dkt. No. 171, Ex. B, at 10.) This disputed term appears in Claims 1 and 16.

*Blockbuster* construed "accumulating information regarding labeled content" to mean "gathering and/or updating information regarding labeled content in which the visitor has indicated an interest." *Blockbuster* at 39.

(1) The Parties' Positions

Plaintiff argues that "by adding the requirement that only 'representative categories' of information get registered, Defendants propose a construction that both: 1) reads out the multiple embodiments described . . . and 2) limits the claim to one particular embodiment." (Dkt. No. 217, at 23 (citing '592 Patent at 2:15-21, 2:22-24, 2:34-42, 3:41-43, 5:61-67 & 6:1-2 (quoted below)).)

Defendants respond that *Blockbuster* did not construe the "registering" term here disputed. (Dkt. No. 229, at 33.) Defendants argue that "the registering phrase refers to part of a larger accumulation process." (*Id.*, at 34.)

(2) Analysis

The specification discloses:

The accumulation process functions when a visitor accesses a URL and the associated Web Content Items. At that point the program registers the representative categories belonging to the web page. If this is a new visitor, a new "visitor file" for that visitor is created; otherwise, a previous visitor file is

accessed.  In either case, the statistics on the accessed categories is updated in the visitor's file.

('592 Patent at 5:61-67; *see also id.* at 5:51-55 ("This personalization can be done according to the accumulated data in the visitor's file, gathered implicitly by observing which Web Content Items, and therefore which categories[,] have been of interest to the visitor in the past."); *id.* at 2:15-24 ("For example, a visitor may demonstrate interest in football and, in particular, his favorite football team.  The present invention learns this by observing the behavior of the visitor, i.e., which sports articles he reads . . . ."); *id.* at 2:34-42 ("the invention can accumulate a visitor profile unobtrusively); *id.* at 3:41-43 ("visitor profile data . . . based on actual content viewed by the visitor); *id.* at 6:1-2 (visitor interest "based on accessed Web Content Items").

The specification thus demonstrates that "registering" is part of an accumulation process and requires creating or updating a visitor profile with information about accessed content. Plaintiff's proposal to include "accumulating" is therefore rejected as confusing and potentially circular.  Defendants' proposed construction, however, includes the constituent term "registering" and thus fails to fully resolve the parties' dispute.  Finally, Defendants' proposal of "representative categories" is too narrow as it excludes, for example, keywords.  (*See* '592 Patent at 2:34-37, 5:40-43 & 6:60-65; *see Vitronics Corp. v. Conceptronic Inc.*, 90 F.3d 1576, 1582-83 (Fed. Cir. 1996) (finding that a construction wherein the "preferred (and indeed only) embodiment . . . would not fall within the scope of the patent claim . . . is rarely, if ever, correct and would require highly persuasive evidentiary support").)

The Court therefore hereby construes **"registering the labeled accessed content"** to mean **"creating or updating a personalized data file with information reflecting that a visitor has accessed the labeled content."**

**J. "personalized data file," "data file for each of a plurality of visitors," "visitor['s] data file[s]," "visitor files," "data file for at least one visitor," "data files for visitors," and "visitor data file for a visitor"**

| Plaintiff's Proposal | Defendants' Proposed Construction |
| --- | --- |
| "a collection of information about or corresponding to a visitor, including visitor interest/preference information (such as the visitor's behavior or demographic information), which can be provided by or observed about the visitor" | Staples Defendants:<br>    "a complete named collection of information generated by a program on the web site server and stored on the web site server as a single unit about or corresponding to a single visitor, including interest/preference information (such as the visitor's behavior or demographic information), which can be provided by or observed about the visitor"<br><br>Defendant REI:<br>    "a file on the web site server generated by a program on the server that contains a collection of information about or corresponding to a single visitor, including interest/preference information (such as the visitor's behavior or demographic information), which can be provided by or observed about the visitor" |

(Dkt. No. 217, at 24.)  These disputed terms appear in Claims 1, 3, 4, 10, 11, 16, 17, 20, 21, and 25.  The parties have agreed that all of these disputed terms should be given the same construction.  (*Id.*)

Plaintiff proposes the construction that the Court reached in *Blockbuster*.  *Blockbuster* at 30.

(1)  The Parties' Positions

Plaintiff submits that *Blockbuster* rejected arguments similar to those presented here by Defendants as to how the visitor file is created and where it is stored.  (Dkt. No. 217, at 25.)  Plaintiff argues that "Defendants have either created these additional requirements out of whole cloth without any support from the specification ('complete' and 'named'), or selectively imported them from specific embodiments described in the specification ('generated by a

program . . .', 'stored on the web site server' and 'a file on the web site server'), both of which are improper."  (*Id.*)

Defendants respond that unlike in *Blockbuster*, "[t]he parties do not here dispute a personal data file's content; instead the current disputes focus on where the 'file' is generated and stored, and its definition."  (Dkt. No. 229, at 23.)  Defendants argue that in the specification and the prosecution history, the patentee has explained that the data file is stored at a web site server.  (*Id.*, at 23-24.)  As to the constituent term "file," the Staples Defendants argue that their proposed construction is consistent with the extrinsic technical dictionary cited by Plaintiff.  (*Id.*, at 25.)  The Staples Defendants urge that "Plaintiff's construction of a file as a 'complete named collection of information' [*sic*, a 'collection of information'] on the other hand is incomplete and unhelpful, as it could apply not only to a file but also to a collection of many files or also to select information within a single a [*sic*] file."  (*Id.*, at 25-26.)  Finally, Defendants argue that reexamination amendments substantively changed the scope of the claims at issue because "[a] change from the requirement of one or more visitors to at least two visitors substantively changes the meaning."  (*Id.*, at 26.)

Plaintiff replies that "Defendants propose importing limitations both from exemplary embodiments in the specification ('generated by a program on the server' and 'stored on the web site server') and from extrinsic evidence ('complete,' 'named' and 'single unit')."  (Dkt. No. 235, at 14.)  Plaintiff argues that while it is "undoubtedly true" that "the invention is a 'server-side' focused invention," as Defendants have argued,

> the fact that the invention is "implemented on a web site server" does *not* mean
> that the invention cannot make use of data (*e.g.*, data from a visitor data file) that
> does not "reside" on the web site server itself.  The "web site server" can indeed
> utilize information that does not reside on the web site server, just as any

computer system can utilize data it receives from external sources; and nothing in the specification states otherwise.

(*Id.*, at 15.)

<u>(2)  Analysis</u>

As for the claim language itself, Claim 1 is representative and recites (emphasis added; reproduced in amended form without indicating the amendments):

> 1.  A method of customizing a web site, said method comprising:
> labeling content of the web site;
> when at least one visitor accesses the content of the web site, registering the labeled accessed content in a *personalized data file*;
> storing the *data file* for the at least one visitor;
> generating at least one pre-customized display for a first visitor;
> caching the at least one pre-customized displays [*sic*] on a server computer;
> displaying the at least one pre-customized display to the first visitor;
> analyzing a *personalized data file* of a second visitor and associating the second visitor with the same at least one pre-customized display, wherein said analyzing the *personalized data file* of the second visitor is performed after said generating; and
> displaying said same at least one pre-customized display to the second visitor, wherein said same at least one pre-customized display is not regenerated before displaying said same at least one pre-customized display to the second visitor.

On balance, nothing in the claims demands that a data file must be "complete" or "named" or that it must be located on, or generated by, the web site server.

As for the specification, the Summary of the Invention states: "As the content is delivered to the visitor in the form of a web page, the number of keyword directives attached to the content is accumulated into a specified visitor profile." ('592 Patent at 2:34-37.)  One stated objective is to "provide efficient management and storage of visitor profile data for large web sites that may have as many as 10 million visitors or more." (*Id.* at 3:49-51.)  The specification then discloses a "server computer 130" with "memory 134 [that] stores a set of computer programs to implement

the processing associated with the invention." (*Id.* at 4:29-33; *see* Figs. 1 & 3) Upon a client sending a request to the web site server, "[i]f there is no file for this visitor, the program generates a file based on the visitor so as to determine the visitors reference [*sic*, visitor's preference] for the next page requested." (*Id.* at 6:57-59; *see id.* at Fig. 3.)

Although these disclosures suggest that the relevant "file" is on a web server, "[c]onstruing the claims in light of the specification does not, however, imply that limitations discussed in the specification may be read into the claims. It is therefore important not to confuse exemplars or preferred embodiments in the specification that serve to teach and enable the invention with limitations that define the outer boundaries of claim scope." *Intervet*, 617 F.3d at 1287. Also of note, Claim 11 explicitly recites, in relevant part: "visitor files stored in said computer memory of said web site server computer." Defendants' proposed "web site server" limitation would therefore be redundant in Claim 11. On balance, storing the visitor "file" on a web server is disclosed as a feature of a preferred embodiment and should not be imported into the construction of the "data file" terms. *See Electro Med.*, 34 F.3d at 1054.

Defendants have also cited the patentee's reliance upon the server during prosecution:

Barrett [(United States Patent No. 5,727,129)] appears to be more concerned with the user side of a user-server arrangement, whereas the embodiments within [the] current Application are more concerned with the server-side of a visitor-server arrangement.

(Dkt. No. 229, Ex. E, 1/12/2001 Reply to Office Action, at 4; *see id.*, Ex. C, 6/6/2011 Reply to Office Action, at 13 (patentee stated that because "Barrett . . . provides a system for a web browser to generate user help information," "it would be inefficient for Barrett to store its user profiles and perform caching at a web site").) Although such statements might be read as suggesting that the relevant "file" is on a web server, on balance the patentee made no definitive

statements in that regard. *See Omega Eng'g v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir.

2003) ("As a basic principle of claim interpretation, prosecution disclaimer promotes the public

notice function of the intrinsic evidence and protects the public's reliance on *definitive*

statements made during prosecution.") (emphasis added).

As to whether a "file" must be a "complete" and "named" collection of information, both

sides have cited an extrinsic technical dictionary definition of "file" as meaning:

> A complete, named collection of information, such as a program, a set of data
> used by a program, or a user-created document. A file is the basic unit of storage
> that enables a computer to distinguish one set of information from another. A file
> might or might not be stored in human-readable form, but it is still the "glue" that
> binds a conglomeration of instructions, numbers, words, or images into a coherent
> unit that a user can retrieve, change, delete, save or send to an output device.

(Dkt. No. 171, Ex. D, at 5 (quoting *Microsoft Press Computer Dictionary* 144 (1991)); Dkt.

No. 229, at 25.)

Nothing in the specification is contrary to this extrinsic, technical definition of "file" as a

"complete, named collection," but such extrinsic evidence must be relied upon with caution. *See*

*Phillips*, 415 F.3d at 1321 (noting that "heavy reliance on the dictionary divorced from the

intrinsic evidence risks transforming the meaning of the claim term to the artisan into the

meaning of the term in the abstract, out of its particular context, which is the specification"); *see*

*also id.* at 1322 ("A claim should not rise or fall based upon the preferences of a particular

dictionary editor, or the court's independent decision, uninformed by the specification, to rely on

one dictionary rather than another.").

On balance, Defendants' proposal of a "complete named collection" is too narrow. For

example, "complete" might improperly imply that no further information can be added. (*See*

'592 Patent at 5:61-65 & 7:15-20 ("the visitor file is an evolving file").) Similarly, "named"

might be read to require a "name," in the common sense of the word, as opposed to a number or some other suitable identifier.

Nonetheless, the constituent term "file" should carry some meaning, and Plaintiff's proposal of a vague, amorphous "collection" of information could conceivably be satisfied by any group of information. *See Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so."). The Court therefore construes the disputed term so as to require a "distinct" collection of information. Such a construction avoids the overbreadth of Plaintiff's proposal without importing the overly strict limitations found in the above-quoted extrinsic dictionary definition advanced by Defendants.

Finally, Defendants' proposal that the file must be "stored . . . as a single unit" should be rejected as unsupported and potentially too narrow. For example, Defendants' proposal might exclude files that are stored as multiple file fragments. Not even the above-quoted extrinsic dictionary definition would support such a limitation. Likewise, Defendants' have failed to adequately support their proposal that a data file must correspond to only a "single visitor" as opposed to possibly multiple visitors.

The Court accordingly hereby construes **"personalized data file," "data file for each of a plurality of visitors," "visitor['s] data file[s]," "visitor files," "data file for at least one visitor," "data files for visitors,"** and **"visitor data file for a visitor"** to mean **"a distinct collection of information about or corresponding to a visitor, including visitor interest/preference information (such as the visitor's behavior or demographic information), which can be provided by or observed about the visitor."**

## K. "generated" and "generating"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "created" and "creating" | "computed" and "computing" |

(Dkt. No. 217, at 25.)  These disputed terms appear in Claims 1 and 16.

In *Blockbuster*, the parties agreed that "generating" means "creating."  *See Blockbuster* at 31.

### (1)  The Parties' Positions

Plaintiff argues that Defendants' proposal of "computing" is inadequate because "[t]he use of the term 'computing[]' only serves to describe that a computer performs the action, not what the computer is doing when performing that action," such that "it does not, in any way, describe what it means to 'generate' a pre-customized display."  (Dkt. No. 217, at 26.)  Plaintiff also cites the "Background" section of the specification as using the term "generated" to mean "created."  (*Id.*, at 25-26 (citing '592 Patent at 1:33-47).)

Defendants respond that "the specification repeatedly uses 'computing' and 'computed' as synonyms for 'generating' and 'generated.'"  (Dkt. No. 229, at 21.)  Defendants argue that "Plaintiff's definition for 'generated' as 'created' is unhelpful and misleading because a webpage can be created from cached components, and cached components can create components on a webpage."  (*Id.*)  Defendants also argue that the "Background" passage relied upon by Plaintiff "describe[es] different presentation formats, which is not the subject of the patent."  (*Id.*, at 22.)

Plaintiff replies that "[t]he word 'compute' and its variants (e.g., computational, computing, computer program) are used in very disparate ways in the specification, and not to mean 'generate.'"  (Dkt. No. 235, at 15 (citing '592 Patent at 2:7-8, 3:2-4 & 6:17-20).)

At the November 5, 2013 hearing, the Court inquired whether the parties would be opposed to construing "generated" and "generating" to have their plain meaning. Plaintiff was not opposed, but Defendants' maintained their proposed constructions.

(2)  Analysis

The "Background" section of the specification uses the word "generating" in the context of "creat[ing]" web pages:

> A server computer can use a technique known as "dynamically-generated customized pages" to *create* a web page in response to a request for information from a client computer. A dynamically-generated customized page results in a set of information in a particular format. For example, a first client computer may support the ability to represent information in a number of columns, while a second client computer may support the ability to represent information in a table. Thus, a server computer receiving a request from the first client computer can dynamically generate the requested information in a format with columns. It can respond to a request from the second client computer by dynamically generating the requested information in table format. In this example, two customized pages are *created* to represent the same information.

('592 Patent at 1:33-47 (emphasis added).)

The Summary of the Invention, by contrast, states that because "most of the visitors simply receive a web page that was *already dynamically generated* for a previous visitor," "the invention allows 'personalized' pages to be *constructed* by choosing from a set of *previously computed* pages, rather than by *dynamically computing* each page for every visitor." (*Id.* at 3:18-23 (emphasis added); *see also id.* at 1:63-64 ("using dynamically-generated customized pages [to] *compute* customized pages for each visitor") (emphasis added); *id.* at 2:6-8 ("in existing systems a computer program must be executed to completely generate each dynamic page on every single request"); *id.* at 3:2-4 ("Since previously generated personalized page components need not be re-generated for every visitor, computational overhead is reduced tremendously . . . ."); *id.* at 3:34-35 ("assembling personalized pages based on information

47

contained in the visitor profile, without requiring a full dynamically-generated customized page computation for each visitor"); *id.* at 6:17-20 ("The system thereby conserves computing resources and retains a higher access speed on a server as opposed to those systems that dynamically generate customized pages for each visitor.").)

As to extrinsic evidence, Defendants have cited technical literature that states: "Web servers provide two types of data: static data from files stored at a server and dynamic data which are *constructed by programs* that execute at the time a request is made." (Dkt. No. 229, Ex. I, Iyengar & Challenger, *Improving Web Server Performance by Caching Dynamic Data* JTDEF0000930 (1997) (emphasis added).)

The above-discussed evidence reveals no "reasonably clear," "consistent" lexicography or use of synonyms for "generating." *Intellicall*, 952 F.2d at 1388 (quoting *Lear Siegler, Inc. v. Aeroquip Corp.*, 733 F.2d 881, 889 (Fed. Cir. 1984)). Rather than crystallizing different positions regarding the scope of the disputed term, the parties' arguments have merely presented competing proposals for explaining the ordinary meaning of "generating." Either side's proposal would introduce potential confusion. For example, Defendants propose "computing," but substantially all of the operations discussed in the '592 Patent involve computers and therefore involve "computing," at least in some sense.

Thus, because construing "generated" and "generating" would only tend to confuse rather than clarify the scope of the claims, the Court hereby expressly rejects the parties' proposed constructions. No further construction is necessary. *See U.S. Surgical*, 103 F.3d at 1568 ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy."); *see also O2*

*Micro*, 521 F.3d at 1362 ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims."); *Finjan*, 626 F.3d at 1207 ("Unlike *O2 Micro*, where the court failed to resolve the parties' quarrel, the district court rejected Defendants' construction.").

The Court therefore hereby construes **"generated"** and **"generating"** to have their **plain meaning**.

## L.  "server computer(s)" and "server"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| "one or more computers that have one or more programs which serve content over a network to other computers" | "one or more computers, each of which have one or more programs which serve content over the internet to a client" |

(Dkt. No. 217, at 26.)  These disputed terms appear in Claims 1, 8, 10, 11, 16, 17, and 25.

Plaintiff proposes the construction that the Court reached in *Blockbuster*.  *Blockbuster* at 35.  At the November 5, 2013 hearing, Defendants agreed to adopt Plaintiff's proposed construction.

The Court accordingly hereby construes **"server"** and **"server computer"** to mean **"one or more computers that have one or more programs which serve content over a network to other computers."**

## M.  "storing the data file" and "storing the personalized data file"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| "placing the data file in memory" | "saving the personalized data file" |

(Dkt. No. 217, at 27.)  These disputed terms appear in Claims 1, 16, and 25.

Plaintiff submits it proposes the construction that the parties in *Blockbuster* agreed upon prior to the *Blockbuster* claim construction hearing.  (Dkt. No. 217, at 27.)  Plaintiff argues that

"[u]nlike 'pre-customized' web content, which is specifically stored 'in a cache,' the specification does not limit how or where the visitor profile or visitor data file is stored." (*Id.*) Plaintiff further notes that "the '592 Patent does not include a single instance of the word 'saving.'" (*Id.*, at 28.)

In response, Defendants have withdrawn their opposition to Plaintiff's proposed construction. (Dkt. No. 229, at 22 n.27.) At the November 5, 2013 hearing, Defendants confirmed that they agree to adopt Plaintiff's proposal.

The Court therefore hereby construes **"storing the data file"** and **"storing the personalized data file"** to mean **"placing the data file in memory."**

**N. "labeling content of the web site," "labeling the content of the web site," and "labeling content of a web site"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "assigning labels, such as categories and/or keywords, to web site content" | Does not need to be construed/independently construed.<br><br>This phrase in claims 10, 16 and 17 is substantively different than the corresponding phrase that existed in the claims prior to the reexamination, "labeling the content of a website." |

(Dkt. No. 217, at 28.) The first of these disputed terms appears in Claims 1 and 25. The second appears in Claim 2. The third appears in Claims 10, 16, and 17.

(1) The Parties' Positions

Plaintiff submits it proposes the construction that the parties in *Blockbuster* agreed upon prior to the *Blockbuster* claim construction hearing. (Dkt. No. 217, at 28.)

Defendants respond that "there is no evidence in the specification whether or how categories and keywords relate to labeling," and Defendants argue that Plaintiff's proposal

"confus[es] a preferred embodiment with a limitation."  (Dkt. No. 229, at 32.)  Defendants also

submit that the parties' agreement in *Blockbuster* does not bind the parties or the Court in the

above-captioned case.  (*Id.*)  Finally, Defendants argue that amendments during reexamination

substantively changed the scope of the claims:

> Where previously the claim language identified *the* (definite article) content of the
> website, the claim language now requires only labeling *some* content of the
> website.  This change in claim meaning was instrumental in overcoming the basis
> for the examiner's rejection, the hallmark of a substantive change.  If, as Plaintiff
> now suggests, this represents *no* change in the meaning of the term (*see* [Dkt. No.
> 217, Ex. G,] at 3), then Plaintiff failed to cure the fatal defect in its claim, contrary
> to what it told the examiner.

(*Id.*, at 33.)[5]

(2)  Analysis

The specification discloses that "[i]n the preferred embodiment, the developer can assign

at least one category and/or keyword to each of the Web Content Items."  ('592 Patent at

5:40-43; *see also id.* at 5:63-64 ("the program registers the representative categories belonging to

the web page"); *id.* at 6:60-65 ("determine the visitor's interests as determined by the keywords

associated with prior Web Content Items served").)

Plaintiff's proposal does not substantively construe the disputed terms other than by

listing "categories" and "keywords" as examples of labels.  As Defendants have noted, above,

the *Blockbuster* construction was agreed upon by the parties there.  No such agreement has been

reached here.  On balance, the listing of examples is unnecessary, and any potential benefit is

outweighed by risk that the examples might be perceived as limiting by the finder of fact.  *Cf.*

*Funai Elec. Co., Ltd. v. Daewoo Elec. Corp.*, 616 F.3d 1357, 1366 (Fed. Cir. 2010) ("The

---

[5] Dependent Claim 2 still recites, in relevant part (emphasis added): "labeling *the* content of the
web site."

criterion is whether the explanation aids the court and the jury in understanding the term as it is used in the claimed invention.").  Plaintiff's proposed construction is therefore hereby expressly rejected.  No further construction is necessary.  *See U.S. Surgical*, 103 F.3d at 1568; *see also O2 Micro*, 521 F.3d at 1362; *Finjan*, 626 F.3d at 1207.

The Court accordingly hereby construes **"labeling content of the web site," "labeling the content of the web site,"** and **"labeling content of a web site"** to have their **plain meaning**.

O.  **"accumulating information regarding labeled content"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "gathering and/or updating information regarding labeled content in which the visitor has indicated an interest" | Does not need to be construed/independently construed. |

(Dkt. No. 217, at 29.)  This disputed term appears in Claims 10 and 17.

Plaintiff proposes the construction that the Court reached in *Blockbuster.  Blockbuster* at 39.  Plaintiff submits that "when a visitor indicates an interest in content on the web site (*e.g.*, by accessing or requesting such content), information about that content – for example, that such content was accessed – is gathered in the Visitor File."  (Dkt. No. 217, at 29.)  Defendants respond that "[t]he jury can determine what is labeled, and then what is accumulated as labeled content[,] without guidance from the Court in the use of these standard English words."  (Dkt. No. 229, at 34.)

Because the claim language that surrounds the disputed term in Claims 10 and 17 is less than clear about the connection between the visitor's interests and the accumulated information, Plaintiff's proposed construction will be helpful to the finder of fact.  *Cf. Funai Elec.*, 616 F.3d at 1366 ("The criterion is whether the explanation aids the court and the jury in understanding

the term as it is used in the claimed invention.").  Plaintiff's proposed construction, which is the construction that the court reached in *Blockbuster*, is also supported by the specification:

> The accumulation process functions when a visitor accesses a URL and the associated Web Content Items.  At that point the program registers the representative categories belonging to the web page.  If this is a new visitor, a new "visitor file" for that visitor is created; otherwise, a previous visitor file is accessed.  In either case, the statistics on the accessed categories is *updated* in the visitor's file.

('592 Patent at 5:61-67 (emphasis added); *see id.* at 5:51-55 ("This personalization can be done according to the accumulated data in the visitor's file, *gathered* implicitly by observing which Web Content Items, and therefore which categories have been of *interest to the visitor* in the past.") (emphasis added).)

The Court therefore hereby construes **"accumulating information regarding labeled content"** to mean **"gathering and/or updating information regarding labeled content in which the visitor has indicated an interest."**

**P.  "category"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "a descriptor or classifier that can be assigned to a web content item and can be used to determine visitor interests/preferences, such as a broad definition or keyword" | Does not need to be construed/independently construed. |

(Dkt. No. 217, at 30.)  This disputed term appears in Claims 2, 3, 4, 10, and 17.

Plaintiff submits it proposes the construction that the parties in *Blockbuster* agreed upon prior to the *Blockbuster* claim construction hearing.  (Dkt. No. 217, at 30.)  Defendants respond that "category" is "a non-technical term that is familiar to any jury."  (Dkt. No. 229, at 34.)

The specification discloses that categories can be assigned to web content so as to characterize the interests of a visitor who accesses that content:

In the preferred embodiment the developer can then assign at least one category and/or a keyword to each of the Web Content Items. These categories and key words are used to determine visitor interest when they access Web Content Items on a Web Site.

In such a preferred embodiment, the developer thereby defines all the categories that can be used within the system. The categories might be broad definitions and/or include keywords.

('592 Patent at 5:41-49.)

As Defendants have noted, above, the *Blockbuster* construction was agreed upon by the parties there. No such agreement has been reached here. On balance, the context and examples proposed by Plaintiff are unnecessary, and any potential benefit is outweighed by risk that the examples might be perceived as limiting by the finder of fact. *Cf. Funai Elec.*, 616 F.3d at 1366 ("The criterion is whether the explanation aids the court and the jury in understanding the term as it is used in the claimed invention."). Plaintiff's proposed construction is therefore hereby expressly rejected. No further construction is necessary. *See U.S. Surgical*, 103 F.3d at 1568; *see also O2 Micro*, 521 F.3d at 1362; *Finjan*, 626 F.3d at 1207.

The Court accordingly hereby construes **"category"** to have its **plain meaning**.

## Q. "prioritizing the categories in the data file"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "weighting the categories in the personalized data file based on a criterion, such as time of access" | Does not need to be construed/independently construed. |

(Dkt. No. 217, at 30; Dkt. No. 248, Ex. A, at 12.) This disputed term appears in Claim 4.

Plaintiff submits it proposes the construction that the parties in *Blockbuster* agreed upon prior to the *Blockbuster* claim construction hearing. (Dkt. No. 217, at 30.) Defendants respond that "[s]imilar to 'category,' the term 'prioritizing' is a non-technical term, familiar to any jury,

and again one that Plaintiff has not alleged was accorded any special meaning by the patentee as its own lexicographer." (Dkt. No. 229, at 34.)

The specification discloses:

> [T]he visitor can still be shown other content not necessarily directly related to his or her interests. The visitor can still access these hyperlinks and URLs; therefore, in the preferred embodiment, the visitor file is an evolving file, since the visitor's interests can change over time for a number of reasons. Therefore, the present invention can allow an option to *give greater weight to recently accessed Web Content Items.*

('592 Patent at 7:14-21 (emphasis added); *see id.* at 6:63-66 ("[I]n one embodiment, there may be a weighing factor or other algorithmic determination for the additional Web Content Items viewed by the visitor during the most recent usage.").)

As Defendants have noted, above, the *Blockbuster* construction was agreed upon by the parties there. No such agreement has been reached here. On balance, the context and examples proposed by Plaintiff are unnecessary, and any potential benefit is outweighed by risk that the examples might be perceived as limiting by the finder of fact. *Cf. Funai Elec.*, 616 F.3d at 1366 ("The criterion is whether the explanation aids the court and the jury in understanding the term as it is used in the claimed invention."). Plaintiff's proposed construction is therefore hereby expressly rejected. No further construction is necessary. *See U.S. Surgical*, 103 F.3d at 1568; *see also O2 Micro*, 521 F.3d at 1362; *Finjan*, 626 F.3d at 1207.

The Court accordingly hereby construes **"prioritizing the categories in the data file"** to have its **plain meaning**.

## R. "pre-customized files"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Does not need to be construed/independently construed. | Staples Defendants:<br>   Indefinite<br><br>Defendant REI:<br>   "predetermined files provided to the visitor based on information in a personalized data file" |

(Dkt. No. 171, Ex. B, at 7.)  This disputed term appears in Claims 11, 12, and 22.

*Blockbuster* construed the term "based on said visitor preferences, to provide pre-customized files to visitor" to mean "identifying at least one pre-customized web content item based on the visitor's preferences and displaying the pre-customized web content item to the visitor from a file in cache so that the at least one pre-customized web content item has the appearance of customization/personalization to the visitor."  *Blockbuster* at 23-24.

(1)  The Parties' Positions

Plaintiff has argued, as to the "based on said visitor preferences, to provide the same pre-customized files . . ." term discussed above, that "[t]he specification defines 'pre-customized files' as pre-customized web content that is cached in a pre-customized file store."  (Dkt. No. 217, at 16 (citing '592 Patent at 6:60-7:11).)

The Staples Defendants argue that the disputed term is "indefinite because it is used in claim 12 in a way that does not narrow the scope of the claim from which it depends, in contravention of the doctrine of claim differentiation."  (Dkt. No. 229, at 6.)  In other words, Defendants argue that "there is no 'pre-customized file' that would not also be a 'pre-customized web content item.'"  (*Id.*, at 7.)  Finally, Defendants submit that "'pre-customized files' appears

nowhere in the specification[,] and the prosecution history is similarly void of any definition."

(*Id.*)

> Plaintiff's full reply argument as to this term is as follows:
>
> The Staples Defendants argue that the term "pre-customized files" is indefinite. The Staples Defendants fail to meet their burden of establishing, by clear and convincing evidence, that "one of ordinary skill would not understand" this term. *See N. Am. Vaccine, Inc. v. Am. Cyanamid Co.*, 7 F.3d 1571, 1579 (Fed. Cir. 1993). That the term can be readily understood is amply demonstrated by the following: 1) both parties in the prior Blockbuster Litigation proposed a construction for this term; 2) this Court previously construed this term; 3) the USPTO Examiners, when the patent originally issued and when it came out of Reexamination, issued claims containing this term; and 4) the Staples Defendants' own co-defendant, REI, proposes a construction for this term in this case. Simply put, the term "pre-customized file" is not indefinite.

(Dkt. No. 235, at 9-10.)

At the November 5, 2013 hearing, the Staples Defendants further elaborated that whereas Claim 12 suggests that the term "pre-customized files" means something more than "pre-customized web content items," there is no way to determine what that something more is. The Staples Defendants concluded that "pre-customized files" is not susceptible to definition and, therefore, is indefinite. Defendant REI, by contrast, confirmed that it is not arguing for a finding of indefiniteness.

### (2) Analysis

*Blockbuster* did not separately construe this disputed term but noted that "pre-customized files" are "stored in cache" and "contain 'web content items' generally as opposed to web pages specifically." *Blockbuster* at 23.

The Staples Defendants have focused on the relationship between Claims 11 and 12, which recite (emphasis added; Claim 11 reproduced in amended form without indicating the amendments):

11.  A computer readable memory that can direct a web site server computer to function in a specified manner, comprising:

visitor files stored in said computer memory of said web site server computer;

*pre-customized web content items* stored in said computer memory of said web site server computer; and

executable instructions stored in said computer memory of said web site server computer, said executable instructions including

(a) instructions to access existing visitor files for visitors;

(b) instructions to review data in existing visitor files to determine visitor preferences; and

(c) instructions, based on said visitor preferences, to provide the same *pre-customized files* from a web site server computer cache to a plurality of visitors.

12.  The computer readable memory of claim 11 *wherein the pre-customized files are pre-customized web content items*.

Defendants have highlighted that the phrase "*the* same pre-customized files" has no explicit antecedent basis.[6]  *See Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008) (noting that "[t]he subsequent use of definite articles 'the' or 'said' in a claim . . . refer back to the same claim term").  Nonetheless, this lack of explicit antecedent basis is not fatal to the claims.  *See, e.g., Energizer Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 1370 (Fed. Cir. 2006).  Instead, rather than being used to invoke an antecedent, the phrase "the same" appears to be used in Claim 11 to emphasize that multiple visitors are provided with the *same* pre-customized files.

Alternatively and in addition, any failure of Claim 12 to be of narrower scope than Claim 11 is insufficient to find indefiniteness here.  *Cf. N. Am. Vaccine*, 7 F.3d at 1577 ("While it is true that dependent claims can aid in interpreting the scope of claims from which they depend, they are only an aid to interpretation and are not conclusive.  The dependent claim tail cannot wag the independent claim dog.");  *Exxon*, 265 F.3d at 1375 ("If a claim is insolubly

---

[6] Claim 22 is similar.

ambiguous, *and no narrowing construction can properly be adopted*, we have held the claim indefinite.") (emphasis added).

As to the proper construction, the best reading of the claim language, in the context of the specification, is that a "pre-customized file" *contains* web content but is not synonymous with the term "web content item(s)." Plaintiff has also suggested that pre-customized files reside in a cache, but surrounding claim language recites a cache, so such a limitation need not be duplicated within the construction of "pre-customized files." Further, as found regarding the "data file" terms, discussed above, a "file" is a distinct collection. Finally, to aid clarity, the Court will construe the disputed term in the singular, namely as "pre-customized file."

The Court therefore hereby construes **"pre-customized file"** to mean **"a distinct collection of pre-customized web content."** Defendants' indefiniteness argument is hereby expressly rejected.

## S. "displaying," "presenting," "provide," and "providing"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Does not need to be construed/independently construed. | "visually presenting" |

(Dkt. No. 171, Ex. B, at 13; Dkt. No. 248, Ex. B, at 14.) These disputed terms appear in Claims 1, 9, 10, 11, 16, 17, 22, and 25. *Blockbuster* did not analyze or separately construe these terms.

### (1) The Parties' Positions

Defendants submit that the parties agree that "presenting," "provide," and "providing" all refer to "displaying," which Plaintiff has proposed means "showing" (within Plaintiff's proposals for the "displaying said same . . ." terms, discussed above). (Dkt. No. 229, at 10-11; *see id.*, at 10 n.20.) Defendants argue that the specification discloses that a client computer includes a

"browser" that visually presents information received from server computers.  (*Id.* (citing '592 Patent at 4:11-26).)  Finally, Defendants urge that "compared with 'visually presenting,' it is not clear that 'showing' requires something a user can see, as 'show' is used in everyday speech to describe words alone."  (*Id.*, at 12.)

Plaintiff replies that "'visually presenting' only appears in the specification with respect to describing a user's browser, rather than any description of a 'web site server.'"  (Dkt. No. 235, at 17 (citing '592 Patent at 4:22-25).)

At the November 5, 2013 hearing, Defendants argued that all of these disputed terms require something that can be seen by a user, that is, by human eyes.  Defendants concluded that because the specification discloses a web browser as a user interface, the web browser is a required part of the invention.

(2)  Analysis

The specification discloses:

FIG. 1 illustrates a client-server computer network 100 that may be operated in accordance with the present invention.  For the preferred embodiment, the network 100 includes at least one client computer 110 and at least one server computer 130.  The client computer 110 and the server computer 130 ar[e] connected by a transmission channel 120, which may be any wire or wireless transmission channel.

The client computer 110 may be a standard computer including a Central Processing Unit (CPU) 112 connected to a memory (primary and/or secondary) 114.  The memory 114 stores a number of computer programs, including a "browser" 116.  As known in the art, a browser is used to communicate with remote server computers 130 and to *visually present* the information received from such computers.  The client computer 110 establishes network communications through a standard network connection device 118.

('592 Patent at 4:11-26 (emphasis added); *see id.* at 5:30-33 ("Web Content Items can be an entire web page, a component of a web page, an insertion into a web page, a graphic link and/or any other items that can be accessed and *viewed by a user*.") (emphasis added).)

As to extrinsic evidence, Defendants cite a technical dictionary definition of "web browser" which states: "The two main functions of a web browser are firstly to send out across the INTERNET a request for the page whose URL the user has typed into it, and secondly to interpret the HTML representation of the page that the remote WEB SERVER returns and *display it on the user's computer screen*." (Dkt. No. 229, Ex. J, *The New Penguin Dictionary of Computing* 542 (2001) (emphasis added).)

On balance, Defendants have not established a genuine dispute regarding the scope of "displaying" or that the meaning of "displaying" in the '592 Patent differs from the ordinary, readily understood meaning of the term. To the extent Defendants' maintain that these disputed terms require the presence of a web browser, Defendants' proposal in that regard is hereby expressly rejected as an attempt to import a limitation from a preferred embodiment. *See Electro Med.*, 34 F.3d at 1054. In light of these findings, no further construction is necessary. *See U.S. Surgical*, 103 F.3d at 1568; *see also O2 Micro*, 521 F.3d at 1362; *Finjan*, 626 F.3d at 1207.

The Court therefore hereby construes **"displaying," "presenting," "provide,"** and **"providing"** to have their **plain meaning**.

**T. "personalizing a web site without dynamically generated web pages for each visitor"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "for at least one visitor, presenting pre-customized web pages from cache without dynamically creating them for each visitor" | "presenting pre-customized web pages from cache without dynamically generating them for each visitor" |

(Dkt. No. 171, Ex. B, at 7-8.) This disputed term appears in the preamble of Claim 10.

At the November 5, 2013 hearing, Plaintiff agreed to adopt Defendants' proposed construction. The Court therefore hereby construes **"personalizing a web site without dynamically generated web pages for each visitor"** to mean **"presenting pre-customized web pages from cache without dynamically generating them for each visitor."**

**U. "display" (noun), "web content," "web page," "page component," and "web component"**

| "display" (noun) (Claims 1, 4-7, 9, 16, 20 & 25) | |
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Does not need to be construed/independently construed. | "web content item(s)" |

| "web content" (Claims 10, 15 & 17) | |
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Does not need to be construed/independently construed. | "one or more web content items" |

| "web page" (Claims 5, 6, 9, 10, 16, 20, 23 & 24) | |
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Does not need to be construed/independently construed. | "an entire page comprised of one or more web content items" |

| "web component" (Claim 5) and "page component" (Claim 23) | |
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Does not need to be construed/independently construed. | "a web content item that is a component of a web page" |

(Dkt. No. 171, Ex. B, at 12, 13 & 14.)

As to "display," Defendants' proposed construction is consistent with intrinsic and extrinsic evidence, but Defendants have not established a genuine dispute regarding the scope of "display" or that the meaning of "display" in the '592 Patent differs from the ordinary, readily understood meaning of the term. In light of these circumstances, no further construction is necessary. *See U.S. Surgical*, 103 F.3d at 1568; *see also O2 Micro*, 521 F.3d at 1362.

As to the other disputed terms, however, Defendants' proposed constructions for "web content," "web page," "page component," and "web component" would be helpful to the finder of fact, and Plaintiff has not contested those proposals.

The Court therefore hereby construes the disputed terms as set forth in the following chart:

| Term | Construction |
|---|---|
| **"display" (noun)** | **Plain meaning** |
| **"web content"** | **"one or more web content items"** |
| **"web page"** | **"an entire page comprised of one or more web content items"** |
| **"page component"**<br><br>**"web component"** | **"a web content item that is a component of a web page"** |

## V. "dynamically generated"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Does not need to be construed/independently construed. | "computed when and as needed" |

(Dkt. No. 171, Ex. B, at 12.) This disputed term appears in Claim 10. *Blockbuster* did not separately address this disputed term.

The constituent term "generated" is a distinct disputed term discussed separately in this Memorandum Opinion and Order. The Court therefore turns to whether "dynamically" should be construed.

Defendants argue that "Plaintiff's representations to the PTO and its tutorial[7] state that dynamic generation of a webpage 'happens 'live' as the visitor waits for the information.'" (Dkt. No. 229, at 22 (citing *id.*, Ex. G, 9/15/2012 Reply to Final Office Action, Ex. B, at 7-8; citing *id.*, Ex. P, Pl.'s Tutorial at 11).)

The specification discloses:

> [T]he caching mechanism of the invention ensures that the dynamic page generation only occurs at most 30 or so times. If one million visitors come to the site, most of the visitors simply receive a web page that was *already dynamically generated for a previous visitor*.

('592 Patent at 3:16-20 (emphasis added).)

As to extrinsic evidence, Defendants have cited a technical dictionary that defines "dynamic" as meaning: "An adjective used to describe events or processes that occur immediately and concurrently *as opposed to those planned for in advance* or reacted to after the fact. Dynamic is used in reference to both hardware and software; in each case it describes some action or event that occurs *when and as needed*." (Dkt. No. 229, Ex. M, *Microsoft Press Computer Dictionary* 120 (1991) (emphasis added); *see also id.*, Ex. J, *The New Penguin Dictionary of Computing* 152 (defining "dynamic" as meaning, in relevant part, "created or allocated when needed, rather than having a more permanent existence").) Although extrinsic dictionary definitions must be used with caution, such evidence can be properly considered. *See Phillips*, 415 F.3d at 1318 ("Because dictionaries, and especially technical dictionaries, endeavor

---

[7] The parties submitted "tutorials" to the Court, prior to the claim construction hearing, to provide the Court with background regarding the technology of the patent-in-suit.

to collect the accepted meanings of terms used in various fields of science and technology, those resources have been properly recognized as among the many tools that can assist the court in determining the meaning of particular terminology to those of skill in the art of the invention.").

On balance, a construction of "dynamically" will be helpful to the finder of fact. Based on the above-cited evidence, the Court hereby construes **"dynamically generated"** to mean **"generated when and as needed rather than in advance."**

## W. "data file of the second visitor"

| Pl.'s Proposal | Defendants' Proposed Construction |
|---|---|
| Does not need to be construed / independently construed. | Staples Defendants:<br>    "a complete named collection of information generated by a program on the web site server and stored on the web site server as a single unit about or corresponding to a single visitor, including interest/preference information (such as the visitor's behavior or demographic information) which can be provided by or observed about the visitor"<br><br>Defendant REI:<br>    "a file on the web site server generated by a program on the server that contains a collection of information about or corresponding to a single visitor, including interest/preference information (such as the visitor's behavior or demographic information), which can be provided by or observed about the visitor" |

(Dkt. No. 171, Ex. B, at 9.) This disputed term appears in Claim 16. Because this term added by amendment during reexamination, *Blockbuster* did not address this term.

Defendants argue that "a separate construction is appropriate because a plain language reading mandates that a data file for a 'second visitor' cannot be the same as a data file of a unique 'previous visitor.'" (Dkt. No. 229, at 26.) Plaintiff, however, has not disputed this. (*See* Dkt. Nos. 217 & 235.) On balance, the meaning of "data file of the second visitor" is self-evident, particularly in light of the Court's separate construction of the disputed term "data file"

in this Memorandum Opinion and Order, above.  No further construction is necessary.  *See U.S. Surgical*, 103 F.3d at 1568; *see also O2 Micro*, 521 F.3d at 1362.

The Court accordingly hereby construes **"data file of the second visitor"** to have its **plain meaning** in light of the Court's construction of the constituent term "data file."

**X.  "said computer memory of said website server computer," "a server computer," "the server computer comprises at least one of a plurality of server computers operating together to provide the web site," "when at least one visitor accesses the content of [the / said] web site," "said same at least one pre-customized display is a web component to be placed as a portion of a web page accessed by the second visitor," and Claims 20-25 as a Whole**

| **"said computer memory of said website server computer" (Claim 11)** ||
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Does not need to be construed/independently construed. | "the same computer memory of the same website server computer referred to earlier in the claim" |
| **"a server computer" (Claim 1)** ||
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Does not need to be construed/independently construed. | This term ("*a* server computer") is substantively different than the corresponding term that existed in the claim prior to reexamination, ("*the* server computer"). |
| **"the server computer comprises at least one of a plurality of server computers operating together to provide the web site" (Claim 8)** ||
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Does not need to be construed/independently construed. | This term is substantively different than the corresponding term that existed in the claim prior to reexamination, "storing the data file can be performed by multiple servers operating in parallel, without loss of information." |

| **"when at least one visitor accesses the content of [the / said] web site" (Claims 1, 16 & 25)** | |
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Does not need to be construed/independently construed. | This term is substantively different than the corresponding term that existed in the claim prior to reexamination, "when at least one visitor accesses the content of *a* web site." |

| **"said same at least one pre-customized display is a web component to be placed as a portion of a web page accessed by the second visitor" (Claim 5)** | |
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Does not need to be construed/independently construed. | This term is substantively different than the corresponding term that existed in the claim prior to reexamination, "the pre-customized display is an insert to be placed within a web content item." |

| **Claims 20-25 as a Whole** | |
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Does not need to be construed/independently construed. | Claims 20-25 were added during the reexamination, have no corresponding claims in the prior version of the patent, and necessarily reflect a change in the scope of the alleged invention claimed post-reexamination. |

(Dkt. No. 171, Ex. B, at 12-14; Dkt. No. 248, Ex. B, at 12.)

(1) "said computer memory of said website server computer"

*Blockbuster* did not address this disputed term. Defendants argue that their proposed construction applies the meaning of "said" throughout Claim 11 so as to "inform the jury that for a website server computer's memory to infringe, the memory must store all the files, items and instructions listed in claim 11." (Dkt. No. 229, at 28.) Defendants also submit that their proposal "is not inconsistent with this Court's prior construction that 'server computer' can

include more than one server because it does not preclude a system with multiple servers that each have a memory storing all the recited files, items and instructions." (*Id.*)

On balance, no claim construction dispute is evident here, as Plaintiff has not disputed the usual significance of the word "said." *See Baldwin*, 512 F.3d at 1342 (noting that "[t]he subsequent use of definite articles 'the' or 'said' in a claim . . . refer back to the same claim term"); *see also Creative Internet Advertising Corp. v. Yahoo!, Inc.*, No. 2010-1215, 476 Fed. App'x 724, 728-29 (Fed. Cir. Apr. 22, 2011) (finding that the phrase "said end user communication message" required the recited logic to act upon the same "an end user communication message" recited earlier in the claim); *LBS Innovs. LLC v. Aaron Bros., Inc.*, No. 2:11-CV-142, 2012 WL 1492330, at *6-*8 (E.D. Tex. Feb. 14, 2012) (Folsom, J.) (construing "said computer" to mean "the same computer that performs the other steps recited in the claim").

The Court therefore hereby construes **"said computer memory of said website server computer"** to have its **plain meaning** in light of the parties' agreed construction of the constituent term "server computer," discussed above.

(2) "a server computer"

This term was added to Claim 1 by amendment during reexamination. Defendants argue that the amendment during reexamination "broadened the scope of claim 1 to include caching on any server computer, or even more than one server, not necessarily the single server computer associated with the web site." (Dkt. No. 229, at 29.) Plaintiff replies that "[a]s the articles 'a' and 'the' have precisely the same meaning under claim construction principles, any amendments changing from one to the other do not, by definition, change the scope of the claim." (Dkt. No. 235, at 7.)

As noted above, the Court has already determined that intervening rights issues will not be addressed until after the present Memorandum Opinion and Order regarding claim construction has been entered.  (*See* Dkt. No. 155, 6/24/2013 Order.)

On balance, no claim construction dispute is evident here because Plaintiff has not disputed the usual significance of the word "a."  *See Baldwin*, 512 F.3d at 1342 (noting that the Federal Circuit "has repeatedly emphasized that an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising'") (citation and internal quotation marks omitted).

The Court therefore hereby construes **"a server computer"** to have its **plain meaning** in light of the parties' agreed construction of the constituent term "server computer," discussed above.

(3)  "the server computer comprises . . ."

This term was added to Claim 8 by amendment during reexamination.  Defendants argue that the reexamination amendments substantively changed the scope of the claim because:

> *First*, "at least one of a plurality of server computers" is broader than "multiple servers," "at least one" meaning "one or more," "multiple" meaning "two or more."  *Second*, the amended language drops the requirement that the servers operate in parallel, understandably given that the claim language now allows for only one server.  *Third*, the antecedent for the amended element of claim 8 is the "caching" step; the antecedent of the former claim 8 was the "storing" step.  A clearer case of substantive amendment is hard to imagine.

(Dkt. No. 229, at 29-30.)

As noted above, the Court has already determined that intervening rights issues will not be addressed until after the present Memorandum Opinion and Order regarding claim construction has been entered.  (*See* Dkt. No. 155, 6/24/2013 Order.)  On balance, no claim construction dispute is evident here, at least as to the amended claims.

The Court therefore hereby construes **"the server computer comprises at least one of a plurality of server computers operating together to provide the web site"** to have its **plain meaning** in light of the parties' agreed construction of the constituent term "server computer," discussed above.

(4) "when at least one visitor accesses the content of [the / said] web site"

These terms were modified by amendment during reexamination. Defendants argue that amendments to Claims 1 and 16 substantively changed the scope of those claims by "add[ing] a requirement that visitor preferences could be determined by tracking visitor activity *only* on the *same* website upon which the claimed system ultimately would display content, whereas the claims previously did not limit the websites, or restrict the number of websites, that could be used for tracking visitor activity." (Dkt. No. 229, at 20.) Plaintiff replies that "[a]s the articles 'a' and 'the' have precisely the same meaning under claim construction principles, any amendments changing from one to the other do not, by definition, change the scope of the claim." (Dkt. No. 235, at 7.)

As noted above, the Court has already determined that intervening rights issues will not be addressed until after the present Memorandum Opinion and Order regarding claim construction has been entered. (*See* Dkt. No. 155, 6/24/2013 Order.)

On balance, no claim construction dispute is evident here because Plaintiff has not disputed the usual significance of the words "the" and "said." *See Baldwin*, 512 F.3d at 1342 (noting that "[t]he subsequent use of definite articles 'the' or 'said' in a claim . . . refer back to the same claim term"); *see also Creative Internet Advertising*, 476 Fed. App'x at 728-29; *LBS Innovs.*, 2012 WL 1492330, at *6-*8.

The Court therefore hereby construes **"when at least one visitor accesses the content of [the / said] web site"** to have its **plain meaning**.

<u>(5) "said same at least one pre-customized display is a web component to be placed as a portion of a web page accessed by the second visitor"</u>

Regarding Claim 5, Defendants argue:

> In response to a prior art rejection, Plaintiff modified the recitation of "the pre-customized display" to read "said same at least one pre-customized display," and further defined the claimed display as being "a web component to be placed as a portion of a web page accessed by the second visitor." As discussed, Plaintiff introduced these amendments to specify that the same content was to be displayed to different users, a feature that Plaintiff argued was missing from the prior art references cited against it. This amendment narrowed the universe of content for display, and added a requirement that such content be displayed to a second visitor. This represents a substantive change in claim scope, because claim 5 as originally issued did not contain such restrictions.

(Dkt. No. 229, at 16 n.23.)

As noted above, the Court has already determined that intervening rights issues will not be addressed until after the present Memorandum Opinion and Order regarding claim construction has been entered. (*See* Dkt. No. 155, 6/24/2013 Order.) On balance, no claim construction dispute is evident here, at least as to the amended claims.

The Court therefore hereby construes **"said same at least one pre-customized display is a web component to be placed as a portion of a web page accessed by the second visitor"** to have its **plain meaning**.

<u>(6) Claims 20-25 as a Whole</u>

Defendants argue that "[a]s none of these claims has a predecessor in the original patent, it is axiomatic that they represent substantive changes to the patent." (Dkt. No. 229, at 35.) Plaintiff replies that because it does not seek pre-reexamination damages for these claims that were added during reexamination, there are no intervening rights issues. (Dkt. No. 235, at 1 n.2.)

Disputed terms within Claims 20-25 are addressed separately elsewhere in this Memorandum Opinion and Order. As noted above, the Court has already determined that intervening rights issues will not be addressed until after the present Memorandum Opinion and Order regarding claim construction has been entered. (*See* Dkt. No. 155, 6/24/2013 Order.) Claims 20-25 therefore do not require any construction "as a whole." Defendants' present request for such construction is therefore hereby expressly denied.

## Y. "determining, after [the / said] caching, a selected category associated with [each / a] visitor's interests"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| Plaintiff proposes that "determining . . . a selected category associated with [each / a] visitor's interest" means "identifying a selected category corresponding to the visitor's interests/preferences." | "identifying a selected category corresponding to [each / a] visitor's interests/preferences after caching preselected web content"<br><br>This term is substantively different than the corresponding term that existed in the claim prior to reexamination, "[code for] determining the selected category associated with the visitor's interest." |

(Dkt. No. 171, Ex. B, at 11-12.) These disputed terms appear in Claims 10 and 17.

*Blockbuster* construed "determining the selected category associated with the visitor's interest" in original Claim 10 to mean "identifying a selected category corresponding to the visitor's interests/preferences." *Blockbuster* at 40.

Defendants submit that after *Blockbuster*, Plaintiff amended the claims during reexamination. (Dkt. No. 229, at 30.) Defendants argue that "Defendants' proposed constructions are correct because they require the 'after the/said caching' limitation that is now expressly recited in the claims." (*Id.*) Defendants also argue that the "after the/said caching" amendments substantively changed the scope of the claims, noting that "only in unusual cases

are claim amendments made to avoid a prior art rejection not substantive." (*Id.*, at 31 (citing *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1348 (Fed. Cir. 1998)).)

As noted above, the Court has already determined that intervening rights issues will not be addressed until after the present Memorandum Opinion and Order regarding claim construction has been entered. (*See* Dkt. No. 155, 6/24/2013 Order.) As to the post-reexamination claims, aside from Plaintiff's assertion that the "after [the / said] caching" phrases do not require construction, the parties are essentially in agreement. The Court therefore hereby construes the disputed terms as set forth in the following chart:

| Term | Construction |
|---|---|
| **"determining, after the caching, a selected category associated with each visitor's interest"** (Claim 10) | **"after caching pre-selected web content, identifying a selected category corresponding to each visitor's interests/preferences"** |
| **"determining, after said caching, a selected category associated with a visitor's interest"** (Claim 17) | **"after caching pre-selected web content, identifying a selected category corresponding to a visitor's interests/preferences"** |

## Z. "second visitor"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Does not need to be construed/independently construed. | This term is substantively different than any corresponding term that existed in the claim prior to reexamination. |

(Dkt. No. 248, Ex. B, at 22.)

This term appears in the parties' October 25, 2013 Joint Claim Construction Charts as a disputed term in Claim 16 (Dkt. No. 248, Ex. A, at 22; *id.*, Ex. B, at 22), but the parties' briefing does not address it. As noted above, the Court has already determined that intervening rights issues will not be addressed until after the present Memorandum Opinion and Order regarding

claim construction has been entered.  (*See* Dkt. No. 155, 6/24/2013 Order.)  On balance, no claim construction dispute is evident here, at least as to the amended claims.

The Court therefore hereby construes **"second visitor"** in Claim 16 to have its **plain meaning**.

## AA.  Means-Plus-Function Limitations

As a preliminary matter, Plaintiff's proposals for these means-plus-function limitations became somewhat unclear at the November 5, 2013 claim construction hearing, at least in Defendants' view.  The Court therefore permitted supplemental briefing on these terms.  In particular, Defendants argue that Plaintiff "sandbagged" Defendants at the hearing with new proposed constructions for the means-plus-function terms.  (*See* Dkt. No. 261, at 1 & 8.)

Based on the positions presented by the parties in their supplemental briefing and at the November 5, 2013, the Court concludes that any variation in Plaintiff's proposals, as well as any surprise experienced by Defendants, is of no moment in the Court's analysis, which is set forth below.  For simplicity, the Court's discussion addresses the versions of Plaintiff's proposals that were disclosed in the parties' October 25, 2013 Joint Claim Construction Charts.  (*See* Dkt. No. 248, Ex. A, at 28-34.)  Plaintiff appears to agree with such an approach.  (*See* Dkt. No. 264, at 1.)

| "means for labeling content of a web site" | |
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Function:<br>    "labeling content of a web site"<br><br>Structure:<br>    Software programmed to assign labels, such as categories and/or keywords, to web site content; *See* Col. 2, Lines 31-40; Col. 4, Lines 29-39; Col. 5, Lines 40-43; Lines 60-64; Col. 6, Lines 60-65. | Function:<br>    "labeling some content of a web site"<br><br>Structure:<br>    Indefinite because the specification sets out no means that corresponds to the stated function.<br>    This term is substantively different than the corresponding term that existed in the claim prior to reexamination, "means for labeling the content of a website." |
| **"means for registering the labeled accessed content in a personalized data file"** | |
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Function:<br>    "registering the labeled accessed content in a personalized data file"<br><br>Structure:<br>    Software programmed to accumulate, create and/or update a personalize[d] data file with information reflecting that the visitor has accessed or viewed the labeled content; *See* Col. 2, Lines 15-17; Lines 34-45; Col. 4, Lines 29-39; Col. 5, Line 61 – Col. 6, Line 5; Col. 7, Lines 21-65. | Function:<br>    AGREED[8]<br><br>Structure:<br>    Indefinite because the specification sets out no means that corresponds to the stated function. |

---

[8] For means-plus-function limitations as to which the parties have agreed upon the claimed function (as noted in this chart), the Court hereby adopts the parties' agreement.

| **"means for storing the data file for at least one visitor"** ||
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Function:<br>    "storing the data file for at least one visitor"<br><br>Structure:<br>    Software programmed to place the data file in memory; *See* Col. 3, Lines 24-29; Col. 4, Lines 29-39; Col. 5, Lines 51-55; Col. 5, Line 60 – Col. 6, Line 3; Col. 6, Line[s] 43-50; Col. 7, Lines 22-65. | Function:<br>    AGREED<br><br>Structure:<br>    Indefinite because the specification sets out no means that corresponds to the stated function. |

| **"means for displaying said same pre-customized display from cache onto a web page accessed by said second visitor without regenerating said same cached pre-customized display for said second visitor"** ||
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Function:<br>    "displaying said same pre-customized display from cache onto a web page accessed by said second visitor without regenerating said same cached pre-customized display for said second visitor"<br><br>Structure:<br>    Software programmed to show the pre-customized display as part of a web page accessed by the second visitor, wherein the previously generated, precustomized display is loaded from a cache and not dynamically recreated before showing; *See* Col. 2, Lines 59-66; Col. 3, Lines 6-24; Col. 4, Lines 29-39; Col. 6, Line 28 – Col. 7, Line 11. | Function:<br>    AGREED<br><br>Structure:<br>    Indefinite because the specification sets out no means that corresponds to the stated function.<br>    This term is substantively different than the corresponding term that existed in the claim prior to reexamination, "means for displaying the precustomized display onto a web page accessed by the visitor." |

| **"means for generating a set of pre-customized displays"** ||
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Function:<br>   "generating a set of pre-customized displays"<br><br>Structure:<br>   Software programmed to create a set of pre-customized displays; *See* Col. 2, Line 46 – Col. 3, Line 24; Col. 4, Lines 29-39; Col. 5, Lines 49-60; Col. 6, Lines 10-12; Col. 6, Line 28 – Col. 7, Line 11. | Function:<br>   AGREED<br><br>Structure:<br>   Indefinite because the specification sets out no means that corresponds to the stated function. |

| **"means for caching the set of pre-customized displays on the server"** ||
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Function:<br>   "caching the set of pre-customized displays on the server"<br><br>Structure:<br>   Software programmed to store the set of pre-customized displays in a manner to provide for faster access in the future; *See* Col. 2, Line 61 – Col. 3, Line 5; Col. 4, Lines 29-39; Col. 5, Lines 55-60; Col. 6, Lines 10-20; Lines 29-42; Col. 7, Lines 6-11. | Function:<br>   AGREED<br><br>Structure:<br>   Indefinite because the specification sets out no means that corresponds to the stated function. |

| **"means for analyzing a personalized data file of the second visitor and, based on visitor preferences of said second visitor, associating said second visitor with a same pre-customized display displayed to a previous visitor"** | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Function: <br><br> "analyzing a personalized data file of the second visitor and, based on visitor preferences of said second visitor, associating said second visitor with a same pre-customized display displayed to a previous visitor" <br><br> Structure: <br><br> Software programmed to review information in the personalized data file of the second visitor and then to identify the at least one pre-customized display, based on such review, wherein the at least one pre-customized display was displayed to a previous visitor; *See* Col. 2, Lines 16-21; Lines 46-61; Col. 4, Lines 29-39; Col. 6, Lines 6-10; Lines 29-42; Col. 6, Line 43 – Col. 7, Line 11. | Function: <br><br> AGREED <br><br> Structure: <br><br> Indefinite because the specification sets out no means that corresponds to the stated function. <br><br> This term is substantively different than the corresponding term that existed in the claim prior to reexamination, "means for analyzing the data file of the visitor and associating the user with a precustomized display." |

| **"computer readable program code means embodied in said medium for searching, said computer readable code means comprising;"** ||
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Function:<br>  "searching" | Function:<br>  AGREED |
| Structure:<br>  Software programmed to label the content of a web site; register the labeled accessed content in a visitor data file; store the visitor data file; generate a set of pre-customized displays; cache the set of pre-customized displays; analyze the personalized data file of the second visitor and associate the second visitor with at least one pre-customized display displayed to a previous visitor; and display the pre-customized display onto a web page accessed by the visitor; *See* Col. 2, Lines 50-55; Col. 4, Lines 29-39; Col. 5, Lines 60-67; Col. 6, Lines 50-66; Lines 60-63; Col. 6, Line 66 – Col. 7, Line 1; Col. 7, Lines 6-10. | Structure:<br>  Indefinite because the specification sets out no means that corresponds to the stated function.<br>  Term as a whole is indefinite. |

(Dkt. No. 171, at Ex. C; Dkt. No. 248, Ex. A, at 28-34.)  These disputed terms all appear in Claim 16.  The parties agree that all of these disputed terms are means-plus-function terms governed by 35 U.S.C. § 112(f).

(1)  The Parties' Positions

Defendants argue:

Each [means-plus-function] construction offered by Plaintiff states "Software programmed to" followed by a construction of the claimed function, followed by citations to the specification.  Nowhere do the constructions describe an actual algorithm that a general purpose computer would use to implement the claimed function.  Plaintiff provides no further explanation in its brief.  Thus, all its constructions are "software" programmed to perform the claimed function, and they are therefore per se indefinite because simply disclosing software is not enough.

(Dkt. No. 229, at 36 (citation and internal quotation marks omitted).) Defendants also argue that

submitting lengthy citations to the jury as part of the Court's constructions would amount to

submitting claim construction disputes to the jury in violation of *O2 Micro*. (Dkt. No. 229, at 37

(citing 521 F.3d at 1362 n.3).) Moreover, Defendants argue, "the text cited by Plaintiff at most

refers to the recited functions without explaining how they are performed." (*Id.*)

> Plaintiff's full reply argument is as follows:
>
> As this Court previously held in the Blockbuster Litigation, sufficient structure, in
> the form of an algorithm, "may be met in several ways," including that the
> algorithm may "be expressed textually." *See Ariba, Inc., v. Emptoris, Inc.*, [No.
> 9:07-CV-90,] 2008 WL 3482521, at *10 (E.D. Tex. Aug. 7, 2008). As
> Defendants thoroughly set out in Defendants' Markman Brief, the steps are
> sufficiently expressed textually. This Court has previously found sufficient
> structure and nothing in the Reexamination proceeding has changed this analysis.
> Accordingly, the Court should maintain its findings from its previous
> construction. *See* [*Blockbuster*] at 44-49.

(Dkt. No. 235, at 17 (footnote omitted).)

(2) Analysis

Title 35 U.S.C. § 112(f) provides: "An element in a claim for a combination may be

expressed as a means or step for performing a specified function without the recital of structure,

material, or acts in support thereof, and such claim shall be construed to cover the corresponding

structure, material, or acts described in the specification and equivalents thereof." Further, "[t]he

scope of a claim under [35 U.S.C.] section 112[(f)] . . . must be limited to structures *clearly*

*linked or associated* with the claimed function in the specification or prosecution history and

equivalents of those structures." *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344

F.3d 1205, 1219 (Fed. Cir. 2003) (emphasis added).

"[A] means-plus-function claim element for which the only disclosed structure is a

general purpose computer is invalid if the specification fails to disclose an algorithm for

performing the claimed function." *Net MoneyIN Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1367 (Fed. Cir. 2008); *see WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999) ("In a means-plus-function claim in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm.").

There is, however, an exception to the general rule requiring an algorithm. Specifically, when the corresponding structure is a general purpose computer, an algorithm is required *unless* the recited function can be achieved by any general purpose computer without special programming. *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1316 (Fed. Cir. 2011) ("Absent a possible narrower construction of the terms 'processing,' 'receiving,' and 'storing,' . . . those functions can be achieved by any general purpose computer without special programming. As such, it was not necessary to disclose more structure than the general purpose processor that performs those functions."); *accord Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1365 (Fed. Cir. 2012) ("In *In re Katz*, we held that '[a]bsent a possible narrower construction' of the terms 'processing,' 'receiving,' and 'storing,' the disclosure of a general-purpose computer was sufficient. . . . In other words, a general-purpose computer is sufficient structure if the function of a term such as 'means for processing' requires no more than merely 'processing,' which any general-purpose computer may do without any special programming.") (citations omitted);[9] *but see id.* ("It is only in the rare circumstances where any general-purpose

---

[9] *See, e.g., Variant Holdings LLC v. Z Resorts LLC*, No. 2:11-CV-290-JRG, 2013 WL 1949857, at *32-*33 (E.D. Tex. May 9, 2013) (no algorithm required for "downloading"); *e-LYNXX Corp. v. Innerworkings, Inc.*, No. 1:10-CV-2535, 2012 WL 4484921, at *21 (M.D. Pa. Sept. 27, 2012) (no algorithm required for "receiving"); *United Video Properties, Inc. v. Amazon.com, Inc.*, No.

computer without any special programming can perform the function that an algorithm need not be disclosed.").

If an algorithm is required, that algorithm may be disclosed in any understandable form. *See Typhoon Touch*, 659 F.3d at 1386 ("Indeed, the mathematical algorithm of the programmer is not included in the specification. However, as precedent establishes, it suffices if the specification recites in prose the algorithm to be implemented by the programmer."); *see also Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008) (noting that "a patentee [may] express th[e] algorithm in any understandable terms including as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure") (citation omitted).

Nonetheless, the purported algorithm cannot "merely provide[] functional language" and must provide a "step-by-step procedure" for accomplishing the claimed function. *Ergo Licensing*, 673 F.3d at 1365; *see Rotatable Techs. LLC v. Nokia Inc.*, No. 2:12-CV-265, 2013 WL 3992930, at *4 (E.D. Tex. Aug. 2, 2013) (Gilstrap, J.). Further, "[i]t is well settled that simply disclosing software, however, without providing some detail about the means to accomplish the function, is not enough.'" *Function Media, L.L.C. v. Google, Inc.*, 708 F.3d 1310, 1318 (Fed. Cir. 2013) (citation and internal quotations and alterations omitted); *see Rotatable Techs.*, 2013 WL 3992930, at *4. Finally, when citing sections of the specification, a patentee should demonstrate "how these sections explain to one of ordinary skill in the art the manner in which the claimed functions are implemented." *Personalized Media*, 2011 WL

CIV.A. 11-003-RGA, 2012 WL 2370318, at *11 (D. Del. June 22, 2012) (no algorithm required for displaying an icon); *Personalized Media Commc'n, LLC v. Motorola, Inc.*, No. 2:08-CV-70-CE, 2011 WL 4591898, at *40 (E.D. Tex. Sept. 30, 2011) (no algorithm required for "transferring said information from one of said decoder[s] to a processor").

4591898, at *38; *see Function Media*, 708 F.3d at 1318 ("These citations all explain that the software automatically transmits, but they contain no explanation of how the PGP software performs the transmission function.").

The existence of the above-discussed *In re Katz* exception to the algorithm requirement, however, reinforces the self-evident proposition that the required degree of disclosure of corresponding structure is commensurate with the complexity of the claimed function.

As discussed below, *Blockbuster* construed the means-plus-function terms by identifying passages in the specification. Courts, including this Court, sometimes take this approach and sometimes do so in combination with additional description of the required structure. *See, e.g., ROY-G-BIV Corp. v. FANUC Ltd.*, No. 2:07-CV-418, 2009 WL 2971097, at *34-*35 (E.D. Tex. Aug. 25, 2009) (Folsom, J.); *ABT Sys., LLC v. Robertshaw Controls Co.*, No. 11 C 5112, 2013 WL 1498997, at *8 (N.D. Ill. Apr. 11, 2013); *Elan Microelectronics Corp. v. Pixcir Microelectronics Co. Ltd.*, No. 2:10-CV-00014-GMN, 2013 WL 2394358, at *25-*26 (D. Nev. May 30, 2013).

Other times, courts analyze and synthesize the corresponding structure based on disclosure in the specification but without citations thereto. *See Apple Inc. v. Samsung Elecs. Co.*, No. 12-CV-00630-LHK, 2013 WL 1502181, at *39-*44, *esp.* at *43-*44 (N.D. Cal. Apr. 10, 2013) (construing "means for transmitting said composite signal" to have corresponding structure based on court's analysis and synthesis of software features disclosed in the specification).

Still other times, courts cite specific steps or elements disclosed in the specification, often together with the reference numerals or identifiers corresponding to those steps or elements. *See, e.g., Guardian Media Techs., Ltd. v. Acer Am. Corp.*, 6:10-CV-597, 2013 WL 1866901, at *11-

*21 & *24-*27 (E.D. Tex. May 2, 2013) (Davis, J.); *MOSAID Techs. Inc. v. Dell Inc.*, 2:11-CV-179, 2013 WL 1739455, at *11-*15 (E.D. Tex. Apr. 22, 2013) (Craven, J.); *Motorola Mobility, Inc. v. TiVo, Inc.*, No. 5:11-CV-53, 2012 WL 6087792, at *20-*27 & *67-*77 (E.D. Tex. Dec. 6, 2012) (Gilstrap, J.).  Not surprisingly, the approach taken by the court typically reflects the approach taken by the parties' arguments.

Here, the parties dispute which approach to take.  The relevant touchstone is whether the Court's construction resolves the parties' claim construction dispute.  *See O2 Micro*, 521 F.3d at 1362-63.  The Court construes the following means-plus-function terms accordingly:

(a)  "means for labeling . . ."

The parties present competing proposed functions but have not adequately explained any substantive dispute.  The Court hereby finds that the claimed function is **"labeling content of a web site."**

In *Blockbuster*, "[t]he court conclude[d] that the following sections of the specification of the '592 Patent provide sufficient structure for the 'means for labeling the content of a web site' limitation: 5:40-43; 2:31-40; 4:29-39; 5:61-64; 6:60-65."  *Blockbuster* at 45.

Plaintiff here similarly proposes that the corresponding structure is:

Software programmed to assign labels, such as categories and/or keywords, to web site content; *See* Col. 2, Lines 31-40; Col. 4, Lines 29-39; Col. 5, Lines 40-43; Lines 60-64; Col. 6, Lines 60-65.

(Dkt. No. 171, Ex. C, at 2.)

Plaintiff's proposal of "software programmed to assign labels, such as categories and/or keywords, to web site content" does not, by itself, amount to sufficient structure.  *See Function Media*, 708 F.3d at 1318.  Therefore, Plaintiff is presumably relying upon the cited passages, which disclose as follows:

*Visitor interests can be tracked by including "keyword directives" in content contained within the web site.* These keyword directives specify a keyword indicating the type of category of information represented by the content. As the content is delivered to the visitor in the form of a web page, the number of keyword directives attached to the content is accumulated into a specified visitor profile. Over time, this visitor profile can represent the types of information the visitor has viewed and serve as an indicator of his or her preferences.

* * *

The server computer 130 includes standard server computer components, including a network connection device 138, a CPU 132, and a memory (primary and/or secondary) 134. The memory 134 stores a set of computer programs to implement the processing associated with the invention. These programs ar[e] collectively referred to as a the [*sic*] web server software 136. The invention may be used with any web server software, including, but not limited to, Netscape Enterprise Server from Netscape Inc., Internet Information Server from Microsoft, or Apache from the Apache HTTP Server Project.

* * *

*In the preferred embodiment the developer can then assign at least one category and/or a keyword to each of the Web Content Items.* These categories and key words are used to determine visitor interest when they access Web Content Items on a Web Site.

* * *

The accumulation process functions when a visitor accesses a URL and the associated Web Content Items. At that point the program registers the representative categories belonging to the web page.

* * *

If a visitor file exists for the current visitor, the program accesses such visitor file to determine the visitor's interests as determined by the keywords associated with prior Web Content Items served, and, in one embodiment, there may be a weighing factor or other algorithmic determination for the additional Web Content Items viewed by the visitor during the most recent usage.

('592 Patent at 2:31-40, 4:29-39, 5:40-44, 5:61-64 & 6:60-66 (emphasis added).)

On balance, these passages disclose that the corresponding structure for the "means for labeling the content of a web site" is **"a general-purpose computer programmed to perform**

the following, and equivalents thereof: (1) include keyword directives in content contained within a web site; or (2) assign at least one category and/or a keyword to each of the Web Content Items." *See Ishida Co., Ltd. v. Taylor*, 221 F.3d 1310, 1316 (Fed. Cir. 2000) (noting that a patent can "disclose[] alternative structures for accomplishing the claimed function"). As a result, Defendants' indefiniteness argument is hereby expressly rejected.

(b) "means for registering . . ."

In *Blockbuster*, "[t]he court conclude[d] that the following sections, when read in conjunction, provide sufficient structure for the 'means for registering the labeled accessed content in a personalized data file' limitation: 5:61-67; 2:34-45; 7:21-65; 4:29-39; 7:32-65." *Blockbuster* at 46.

> Plaintiff here similarly proposes that the corresponding structure is:
>
> Software programmed to accumulate, create and/or update a personalize[d] data file with information reflecting that the visitor has accessed or viewed the labeled content; *See* Col. 2, Lines 15-17; Lines 34-45; Col. 4, Lines 29-39; Col. 5, Line 61 – Col. 6, Line 5; Col. 7, Lines 21-65.

(Dkt. No. 171, Ex. C, at 2.)

Plaintiff's proposal of "software programmed to accumulate, create and/or update a personalize[d] data file with information reflecting that the visitor has accessed or viewed the labeled content" does not, by itself, amount to sufficient structure. *See Function Media*, 708 F.3d at 1318. Therefore, Plaintiff is presumably relying upon the cited passages, which disclose as follows:

> The invention is a method and apparatus for learning in what a visitor is interested and what demographics the visitor may demonstrate so as to deliver personalized information to the visitor based upon accumulated data, and to do so without requiring dynamic page generation for each individual visitor.
>
> * * *

*As the content is delivered to the visitor in the form of a web page, the number of keyword directives attached to the content is accumulated into a specified visitor profile.* Over time, this visitor profile can represent the types of information the visitor has viewed and serve as an indicator of his or her preferences. In this way, the invention can accumulate a visitor profile unobtrusively, without requiring the visitors to fill out a survey or questionnaire. The profile may also be augmented with explicit information the visitor provides over time, such as a name or address provided when ordering a product from the site.

\* \* \*

The server computer 130 includes standard server computer components, including a network connection device 138, a CPU 132, and a memory (primary and/or secondary) 134. The memory 134 stores a set of computer programs to implement the processing associated with the invention. These programs ar[e] collectively referred to as a the [*sic*] web server software 136. The invention may be used with any web server software, including, but not limited to, Netscape Enterprise Server from Netscape Inc., Internet Information Server from Microsoft, or Apache from the Apache HTTP Server Project.

\* \* \*

*The accumulation process functions when a visitor accesses a URL and the associated Web Content Items. At that point the program registers the representative categories belonging to the web page.*

The visitor file contains a Lining tally of the visitor's interest preferably based on accessed Web Contents Items. In a preferred embodiment, an algorithm is included that gives greater weight to more recently accessed Web Content Items, thereby accounting for changing interests and tastes.

\* \* \*

The server request handler 320 can then update the visitor file data with the categories and keyword counts for the information assembled into the final page that is returned to the visitor's browser. The updated visitor file data is delivered back to the visitor data manager 350 and stored in the visitor data file store 375 by the visitor file manager 370.

FIG. 4 shows another embodiment 400 of the invention wherein there are multiple instances of the Server request handler and associated machinery. Web sites often use this form of functional replication to achieve higher performance by sharing the load across multiple server machines. A load balancer, such as a Cisco Local Director, a DNS round robin, or equivalent technology exists between the web

site visitor's browser 410 and a set of server request handlers 431, 432, 433. Each server request handler is a complete copy and typically each one operates on a separate machine. The server request handlers each have their own visitor data manager 441, 442, 443. As a visitor makes multiple requests to the web site, each individual request may be redirected by the load balancer to a different request handle[r] and visitor data manager. Therefore, as the category and keyword counts are updated by each individual server, some special mechanism must be used to ensure that updates are not lost by having one set of visitor data overwrite the results of another. This is the reason for having the visitor file manager 470 as a separate mechanism within the invention. There is only one visitor file manager and it serves as the collection point for all updated data generated by the individual visitor data managers 441, 442, 443. A further refinement is that the visitor data managers communicate an incremental update value to the visitor file manager. For example, consider the case where a visitor makes two requests to the web site, with each request being for a page containing keyword "A". The first request might be handled by server request handler 432 (and visitor data manager 442). The second request might be handled by server request handler 443 (and visitor data manager 443). Each one of these data managers has a visitor profile stating that the visitor saw one instance of the keyword "A". However, when each reports its results back to the visitor file manager 470, the visitor file manager sums the results together thus obtaining the correct value of two instances for the keyword "A". The final result[] is written into the visitor data file store 475 and made available for future operations.

('592 Patent at 2:15-20, 2:34-45, 4:29-39, 5:61-6:5 & 7:21-65 (emphasis added).)

On balance, these passages disclose that the corresponding structure is **"a general-purpose computer programmed to perform the following, and equivalents thereof: (1) accumulate, into a specified visitor profile, the number of keyword directives attached to content that is delivered to the visitor in the form of a web page; or (2) register the representative categories belonging to a web page accessed by a visitor."** *See Ishida*, 221 F.3d at 1316 (noting that a patent can "disclose[] alternative structures for accomplishing the claimed function"). As a result, Defendants' indefiniteness argument is hereby expressly rejected.

### (c) "means for storing the data file for at least one visitor"

In *Blockbuster*, "the court conclude[d] that the following sections of the specification disclose sufficient structure for the 'means for storing the data file for at least one visitor' limitation: 4:29-39; 6:43-50; 7:22-27; 7:32-65." *Blockbuster* at 46.

Plaintiff here similarly proposes that the corresponding structure is:

> Software programmed to place the data file in memory; *See* Col. 3, Lines 24-29; Col. 4, Lines 29-39; Col. 5, Lines 51-55; Col. 5, Line 60 – Col. 6, Line 3; Col. 6, Line 43-50; Col. 7, Lines 22-65.

(Dkt. No. 171, Ex. C, at 2-3.)

On balance, the Court here applies the *In re Katz* exception to the algorithm requirement because the "'storing' function[] can be achieved by any general purpose computer without special programming. As such, it was not necessary to disclose more structure than the general purpose processor that performs th[at] function[]." *In re Katz*, 639 F.3d at 1316.

Thus, the corresponding structure is **"a general-purpose computer."** Defendants' indefiniteness argument is hereby expressly rejected.

### (d) "means for displaying . . ."

In *Blockbuster*, "the court conclude[d] that the following sections of the specification provide sufficient structure for the 'means for displaying the pre-customized display onto a web page accessed by the visitor' limitation: 6:28-7:11; 2:59-66; 3:6-24; 4:29-39." *Blockbuster* at 48 (the term at issue in *Blockbuster* was amended during reexamination; the disputed term in the above-captioned case is "means for displaying said same pre-customized display from cache onto a web page accessed by said second visitor without regenerating said same cached pre-customized display for said second visitor").

Plaintiff here similarly proposes that the corresponding structure is:

Software programmed to show the pre-customized display as part of a web page accessed by the second visitor, wherein the previously generated, pre-customized display is loaded from a cache and not dynamically recreated before showing; *See* Col. 2, Lines 59-66; Col. 3, Lines 6-24; Col. 4, Lines 29-39; Col. 6, Line 28 – Col. 7, Line 11.

(Dkt. No. 171, Ex. C, at 3.)

Plaintiff's proposal of "software programmed to show the pre-customized display as part of a web page accessed by the second visitor, wherein the previously generated, pre-customized display is loaded from a cache and not dynamically recreated before showing," does not, by itself, amount to sufficient structure. *See Function Media*, 708 F.3d at 1318. Therefore, Plaintiff is presumably relying upon the cited passages, which disclose as follows:

> The present invention assembles all of this data and delivers a "personalized" page to the visitor.
>
> The present invention stores personalized page components in a cache. *Subsequent delivery of the same page components is satisfied by retrieving the information from the cache, rather than by dynamically generating it each time.*
>
> * * *
>
> For example, a home page for a large web site might include a personalization directive describing the inclusion of an article related to a visitor's favorite NFL team. The personalization directive function examines the visitor profile, determines the favorite team, and includes the appropriate page with information about that team. In this way, each visitor to the web site might receive a different introductory web page, customized for their preferences. Even though every visitor receives a page that appears to be customized for them, since, in fact, there are only 30 or so NFL teams; the caching mechanism of the invention ensures that the dynamic page generation only occurs at most 30 or so times. If one million visitors come to the site, most of the visitors simply receive a web page that was already dynamically generated for a previous visitor. In essence, the invention allows "personalized" pages to be constructed by choosing from a set of previously computed pages, rather than by dynamically computing each page for every visitor.
>
> * * *

The server computer 130 includes standard server computer components, including a network connection device 138, a CPU 132, and a memory (primary and/or secondary) 134. The memory 134 stores a set of computer programs to implement the processing associated with the invention. These programs ar[e] collectively referred to as a the [*sic*] web server software 136. The invention may be used with any web server software, including, but not limited to, Netscape Enterprise Server from Netscape Inc., Internet Information Server from Microsoft, or Apache from the Apache HTTP Server Project.

* * *

Returning to FIG. 2, the page is illustrative of how a base page is pre-customized to make it seemingly customized for a given visitor. Assuming that a visitor frequents a sports-oriented web site in the preferred embodiment, the main story on the page could be the same for all the pre-customized pages, for example, a Super Bowl story; however, the additional stories on the page can be adjusted with inserts of personalized page components items [*sic*] according to the visitor's preferences, such as individual team information. Assuming that visitor A in prior visits has frequented a number of Web Content Items with a keyword of "football", then when visitor A returns to the web site a page with personalized page components will appear where the page components (e.g., 221, 223, 225) are Web Content Items comprising football-related stories.

FIG. 3 shows a relationship diagram for the invention. Requests begin when a browser 310 operating on a client computer (as in 110 in FIG. 1) makes a request to the web site server (as in 130 in FIG. 1). When the site is being accessed, the server request handler 320 analyzes the incoming request and the corresponding pages, and invokes the monogrammer 330 and the component assembler 340 as necessary.

The component assembler 340 examines the visitor file, if any, to determine if there is a preference to be associated with the accumulated catego[r]y and keyword counts of the visitor. The visitor file is obtained from the visitor data manager 350, which serves as a central coordination point for retrievals and updates of visitor data within a single web server. If there is no file for this visitor, the program generates a file based on the visitor so as to determine the visitors reference [*sic*, visitor's preference] for the next page requested.

If a visitor file exists for the current visitor, the program accesses such visitor file to determine the visitor's interests as determined by the keywords associated with prior Web Content Items served, and, in one embodiment, there may be a weighing factor or other algorithmic determination for the additional Web Content Items viewed by the visitor during the most recent usage. The program then selects a pre-customized page or pre-customized page components which should reflect this interest. These selections can be assembled by a component

assembler 340, and may be further subject to personal modification by a monogrammer 330 to make changes such as inserting the visitor's name onto the page.

The component assembler uses the pre-customized file handler 360, to *retrieve the Web Content Items, formatted as pre-customized pages*, that are appropriate for this visitor. *Pre-customized pages can be cached in a pre-customized file store 365*, or can be dynamically generated on demand by the dynamic page generator 380.

('592 Patent at 2:59-66, 3:6-24, 4:29-39 & 6:28-7:11 (emphasis added).)

On balance, these passages disclose that the corresponding structure is **"a general-purpose computer programmed to retrieve Web Content Items, formatted as pre-customized pages, from pre-customized file store 365; and equivalents thereof."** As a result, Defendants' indefiniteness argument is hereby expressly rejected.

### (e) "means for generating . . ."

In *Blockbuster*, "the court conclude[d] that the following sections of the specification provide sufficient structure for the 'means for generating a set of pre-customized displays' limitation: 2:46-3:23; 6:28-42; 6:43-7:10; 5:49-60; 4:29-39." *Blockbuster* at 47.

Plaintiff here similarly proposes that the corresponding structure is:

Software programmed to create a set of pre-customized displays; *See* Col. 2, Line 46 – Col. 3, Line 24; Col. 4, Lines 29-39; Col. 5, Lines 49-60; Col. 6, Lines 10-12; Col. 6, Line 28 – Col. 7, Line 11.

(Dkt. No. 171, Ex. C, at 3-4.)

Plaintiff's proposal of "software programmed to create a set of pre-customized displays" does not, by itself, amount to sufficient structure. *See Function Media*, 708 F.3d at 1318. Therefore, Plaintiff is presumably relying upon the cited passages, which disclose as follows:

*The present invention then delivers personalized pages to the visitor by examining such visitor's profile.* Another directive, called a personalization directive, may be placed into web pages that are to be customized by the invention. These

directives cause a personalization function to be applied to the visitor's profile data. The result of the personalization function defines an attribute to be used for *locating personalized page fragments, called "page components", that the invention then assembles into a customized page for the visitor.* In this manner, each visitor may receive a page containing three different classes of data: common data received by all visitors, personalized data received by a similar group of visitors, and individual data received only by this one visitor. The present invention assembles all of this data and delivers a "personalized" page to the visitor.

The present invention stores personalized page components in a cache. Subsequent delivery of the same page components is satisfied by retrieving the information from the cache, rather than by dynamically generating it each time. The present invention can therefore take advantage of a common situation where large groups of visitors share similar interests and should receive the same data. Since previously generated personalized page components need not be re-generated for every visitor, computational overhead is reduced tremendously by supplying such pre-generated page components.

For example, a home page for a large web site might include a personalization directive describing the inclusion of an article related to a visitor's favorite NFL team. The personalization directive function examines the visitor profile, determines the favorite team, and includes the appropriate page with information about that team. In this way, each visitor to the web site might receive a different introductory web page, customized for their preferences. Even though every visitor receives a page that appears to be customized for them, since, in fact, there are only 30 or so NFL teams; the caching mechanism of the invention ensures that the dynamic page generation only occurs at most 30 or so times. If one million visitors come to the site, most of the visitors simply receive a web page that was already dynamically generated for a previous visitor. In essence, the invention allows "personalized" pages to be constructed by choosing from a set of previously computed pages, rather than by dynamically computing each page for every visitor.

* * *

The server computer 130 includes standard server computer components, including a network connection device 138, a CPU 132, and a memory (primary and/or secondary) 134. The memory 134 stores a set of computer programs to implement the processing associated with the invention. These programs ar[e] collectively referred to as a the [*sic*] web server software 136. The invention may be used with any web server software, including, but not limited to, Netscape Enterprise Server from Netscape Inc., Internet Information Server from Microsoft, or Apache from the Apache HTTP Server Project.

\* \* \*

The developer can then devise a set of Web Content Items that can 'personalize' the Web Site for the visitor the next time the visitor accesses the web site. This personalization can be done according to the accumulated data in the visitor's file, gathered implicitly by observing which Web Content Items, and therefore which categories have been of interest to the visitor in the past. The 'personalization' will not be a one-time dynamically generated customized web page, which would be too resource intensive and therefore slow, but will be based on predetermined Web Content Items that are developed and then cached into memory.

\* \* \*

Such predetermined content is cached in memory and is, preferably, designed by a web site to appeal to interests in certain topics.

\* \* \*

Returning to FIG. 2, the page is illustrative of how a base page is pre-customized to make it seemingly customized for a given visitor. Assuming that a visitor frequents a sports-oriented web site in the preferred embodiment, the main story on the page could be the same for all the pre-customized pages, for example, a Super Bowl story; however, the additional stories on the page can be adjusted with inserts of personalized page components items [*sic*] according to the visitor's preferences, such as individual team information. Assuming that visitor A in prior visits has frequented a number of Web Content Items with a keyword of "football", then when visitor A returns to the web site a page with personalized page components will appear where the page components (e.g., 221, 223, 225) are Web Content Items comprising football-related stories.

FIG. 3 shows a relationship diagram for the invention. Requests begin when a browser 310 operating on a client computer (as in 110 in FIG. 1) makes a request to the web site server (as in 130 in FIG. 1). When the site is being accessed, the server request handler 320 analyzes the incoming request and the corresponding pages, and invokes the monogrammer 330 and the component assembler 340 as necessary.

The component assembler 340 examines the visitor file, if any, to determine if there is a preference to be associated with the accumulated catego[r]y and keyword counts of the visitor. The visitor file is obtained from the visitor data manager 350, which serves as a central coordination point for retrievals and updates of visitor data within a single web server. If there is no file for this visitor, the program generates a file based on the visitor so as to determine the visitors reference [*sic*, visitor's preference] for the next page requested.

If a visitor file exists for the current visitor, *the program accesses such visitor file to determine the visitor's interests* as determined by the keywords associated with prior Web Content Items served, and, in one embodiment, there may be a weighing factor or other algorithmic determination for the additional Web Content Items viewed by the visitor during the most recent usage. *The program then selects a pre-customized page or pre-customized page components which should reflect this interest. These selections can be assembled by a component assembler 340*, and may be further subject to personal modification by a monogrammer 330 to make changes such as inserting the visitor's name onto the page.

The component assembler uses the pre-customized file handler 360, to retrieve the Web Content Items, formatted as pre-customized pages, that are appropriate for this visitor. Pre-customized pages can be cached in a pre-customized file store 365, or can be dynamically generated on demand by the dynamic page generator 380.

('592 Patent at 2:46-3:24, 4:29-39, 5:49-60, 6:10-12 & 6:28-7:11 (emphasis added).)

On balance, these passages disclose that the corresponding structure is **"a general-purpose computer programmed to dynamically generate a web page for a previous visitor by examining that previous visitor's profile, determining at least one interest of the previous visitor, locating pre-customized page components that reflect that interest, and assembling those pre-customized page components into a customized page for the previous visitor; and equivalents thereof."** As a result, Defendants' indefiniteness argument is hereby expressly rejected.

(f)  "means for caching . . ."

In *Blockbuster*, "[t]he court conclude[d] that the following sections of the specification provide sufficient structure for the 'means for caching the set of pre-customized displays on the server' limitation: 2:61-3:5; 7:6-11; 5:55-60; 6:11; 4:29-39." *Blockbuster* at 47.

Plaintiff here similarly proposes that the corresponding structure is:

Software programmed to store the set of pre-customized displays in a manner to provide for faster access in the future; *See* Col. 2, Line 61 – Col. 3, Line 5; Col. 4,

Lines 29-39; Col. 5, Lines 55-60; Col. 6, Lines 10-20; Lines 29-42; Col. 7, Lines 6-11.

(Dkt. No. 171, Ex. C, at 4.)  Plaintiff's proposal of "software programmed to store the set of pre-customized displays in a manner to provide for faster access in the future" does not, by itself, amount to sufficient structure.  *See Function Media*, 708 F.3d at 1318.  Therefore, Plaintiff is presumably relying upon the cited passages, which disclose as follows:

> *The present invention stores personalized page components in a cache. Subsequent delivery of the same page components is satisfied by retrieving the information from a cache, rather than by dynamically generating it each time.* . . . Since previously generated personalized page components need not be re-generated for every visitor computational overhead is reduced tremendously by supplying such pre-generated page components.
>
> * * *
>
> The server computer 130 includes standard server computer components, including a network connection device 138, a CPU 132, and a memory (primary and/or secondary) 134.  The memory 134 stores a set of computer programs to implement the processing associated with the invention. These programs ar[e] collectively referred to as a the [*sic*] web server software 136.  The invention may be used with any web server software, including, but not limited to, Netscape Enterprise Server from Netscape Inc., Internet Information Server from Microsoft, or Apache from the Apache HTTP Server Project.
>
> * * *
>
> The 'personalization' will not be a one-time dynamically generated customized web page, which would be too resource intensive and therefore slow, but will be based on predetermined Web Content Items that are developed and then *cached into memory*.
>
> * * *
>
> Such predetermined content is *cached in memory* and is, preferably, designed by a web site to appeal to interests in certain topics.
>
> The benefits of the present invention are immediately evident.  The present invention gives the visitor the impression of a customized page visitor [*sic*] when in actuality it presents *pre-customized pages and/or page components that have been cached*.  The system thereby conserves computing resources and retains a

higher access speed on a server as opposed to those systems that dynamically generate customized pages for each visitor.

* * *

Returning to FIG. 2, the page is illustrative of how a base page is pre-customized to make it seemingly customized for a given visitor.  Assuming that a visitor frequents a sports-oriented web site in the preferred embodiment, the main story on the page could be the same for all the pre-customized pages, for example, a Super Bowl story; however, the additional stories on the page can be adjusted with inserts of personalized page components items [*sic*] according to the visitor's preferences, such as individual team information.  Assuming that visitor A in prior visits has frequented a number of Web Content Items with a keyword of "football", then when visitor A returns to the web site a page with personalized page components will appear where the page components (e.g., 221, 223, 225) are Web Content Items comprising football-related stories.

* * *

The component assembler uses the pre-customized file handler 360, to *retrieve the Web Content Items, formatted as pre-customized pages*, that are appropriate for this visitor.  *Pre-customized pages can be cached in a pre-customized file store 365*, or can be dynamically generated on demand by the dynamic page generator 380.

('529 Patent at 2:62-3:5, 4:29-39, 5:55-60, 6:10-20, 6:28-42 & 7:6-11.)

On balance, these passages disclose that the corresponding structure is **"a general-purpose computer programmed to place pre-customized displays in a pre-customized file store 365; and equivalents thereof."**  As a result, Defendants' indefiniteness argument is hereby expressly rejected.

(g)  "means for analyzing . . ."

In *Blockbuster*, "the court conclude[d] that the following sections of the specification provide sufficient structure for the 'means for analyzing the data file of the visitor and associating the user with a precustomized display' limitation: 6:6-10; 2:46-61; 6:43-7:11; 4:29-[3]9; 6:37-42."  *Blockbuster* at 48 (the term at issue in *Blockbuster* was amended during

reexamination; the disputed term in the above-captioned case is "means for analyzing a personalized data file of the second visitor and, based on visitor preferences of said second visitor, associating said second visitor with a same pre-customized display displayed to a previous visitor").

Plaintiff here similarly proposes that the corresponding structure is:

> Software programmed to review information in the personalized data file of the second visitor and then to identify the at least one pre-customized display, based on such review, wherein the at least one pre-customized display was displayed to a previous visitor; *See* Col. 2, Lines 16-21; Lines 46-61; Col. 4, Lines 29-39; Col. 6, Lines 6-10; Lines 29-42; Col. 6, Line 43 – Col. 7, Line 11.

(Dkt. No. 171, Ex. C, at 4-5.)

Plaintiff's proposal of "software programmed to review information in the personalized data file of the second visitor and then to identify the at least one pre-customized display, based on such review, wherein the at least one pre-customized display was displayed to a previous visitor," does not, by itself, amount to sufficient structure. *See Function Media*, 708 F.3d at 1318. Therefore, Plaintiff is presumably relying upon the cited passages, which disclose as follows:

> The invention is a method and apparatus for learning in what a visitor is interested and what demographics the visitor may demonstrate so as to *deliver personalized information to the visitor based upon accumulated data, and to do so without requiring dynamic page generation for each individual visitor.*
>
> * * *
>
> *The present invention then delivers personalized pages to the visitor by examining such visitor's profile.* Another directive, called a personalization directive, may be placed into web pages that are to be customized by the invention. These directives cause a personalization function to be applied to the visitor's profile data. The result of the personalization function defines an attribute to be used for locating personalized page fragments, called "page components", that the invention then assembles into a customized page for the visitor. In this manner, each visitor may receive a page containing three different classes of data:

common data received by all visitors, personalized data received by a similar group of visitors, and individual data received only by this one visitor. *The present invention assembles all of this data and delivers a "personalized" page to the visitor.*

\* \* \*

The server computer 130 includes standard server computer components, including a network connection device 138, a CPU 132, and a memory (primary and/or secondary) 134. The memory 134 stores a set of computer programs to implement the processing associated with the invention. These programs ar[e] collectively referred to as a the [*sic*] web server software 136. The invention may be used with any web server software, including, but not limited to, Netscape Enterprise Server from Netscape Inc., Internet Information Server from Microsoft, or Apache from the Apache HTTP Server Project.

\* \* \*

*When a visitor accesses a web site that has an existing file for that visitor, the program determines from the file and the tallied categories, which pre-customized content, i.e., the personalized page components, to provide to the visitor.*

Such predetermined content is cached in memory and is, preferably, designed by a web site to appeal to interests in certain topics.

\* \* \*

Returning to FIG. 2, the page is illustrative of how a base page is pre-customized to make it seemingly customized for a given visitor. Assuming that a visitor frequents a sports-oriented web site in the preferred embodiment, the main story on the page could be the same for all the pre-customized pages, for example, a Super Bowl story; however, the additional stories on the page can be adjusted with inserts of personalized page components items [*sic*] according to the visitor's preferences, such as individual team information. Assuming that visitor A in prior visits has frequented a number of Web Content Items with a keyword of "football", then when visitor A returns to the web site a page with personalized page components will appear where the page components (e.g., 221, 223, 225) are Web Content Items comprising football-related stories.

FIG. 3 shows a relationship diagram for the invention. Requests begin when a browser 310 operating on a client computer (as in 110 in FIG. 1) makes a request to the web site server (as in 130 in FIG. 1). When the site is being accessed, the server request handler 320 analyzes the incoming request and the corresponding pages, and invokes the monogrammer 330 and the component assembler 340 as necessary.

*The component assembler 340 examines the visitor file, if any, to determine if there is a preference to be associated with the accumulated catego[r]y and keyword counts of the visitor.* The visitor file is obtained from the visitor data manager 350, which serves as a central coordination point for retrievals and updates of visitor data within a single web server. If there is no file for this visitor, the program generates a file based on the visitor so as to determine the visitors reference [*sic*, visitor's preference] for the next page requested.

If a visitor file exists for the current visitor, *the program accesses such visitor file to determine the visitor's interests as determined by the keywords associated with prior Web Content Items served*, and, in one embodiment, there may be a weighing factor or other algorithmic determination for the additional Web Content Items viewed by the visitor during the most recent usage. *The program then selects a pre-customized page or pre-customized page components which should reflect this interest. These selections can be assembled by a component assembler 340*, and may be further subject to personal modification by a monogrammer 330 to make changes such as inserting the visitor's name onto the page.

*The component assembler uses the pre-customized file handler 360, to retrieve the Web Content Items, formatted as pre-customized pages, that are appropriate for this visitor.* Pre-customized pages can be cached in a pre-customized file store 365, or can be dynamically generated on demand by the dynamic page generator 380.

('592 Patent at 2:16-21, 2:46-61, 4:29-39, 6:6-12, 6:28-7:11 (emphasis added).)

On balance, these passages disclose that the corresponding structure is **"a general-purpose computer programmed to perform the following, and equivalents thereof: (1) access the second visitor's file to determine the second visitor's interests as determined by the keywords associated with prior Web Content Items served; (2) select a pre-customized page or pre-customized page components that should reflect at least one of the determined interests of the second visitor; and (3) assemble these selections by using a component assembler 340 that uses the pre-customized file handler 360 to retrieve, from pre-customized file store 365, Web Content Items that are formatted as pre-customized**

**pages and that are appropriate for the second visitor."** As a result, Defendants'

indefiniteness argument is hereby expressly rejected.

<u>(h) "computer readable program code means embodied in said medium for
searching, said computer readable code means comprising;"</u>

As a threshold matter, the Court agrees with Defendants that the semicolon at the end of

this disputed term should be interpreted as a colon. (*See* Dkt. No. 229, at 40.)

*Blockbuster* rejected an argument that the phrase "embodied in said medium for

searching" rendered Claim 16 indefinite. *Blockbuster* at 48-49. *Blockbuster* relied upon

passages in the specification as "explain[ing] that the invention must be able to locate

personalized page fragments and then assemble those fragments into a customized page for a

visitor." *Id.* at 49 (citing '592 Patent at 2:50-55, 6:60-63, 6:66-7:1 & 7:6-10).

Defendants argue that the specification fails to disclose any structure for "searching,"

arguing that "[t]he closest mention is a single reference to 'locating' but there is no description of

how this is accomplished other than by an 'attribute.'" (Dkt. No. 229, at 40 (citing '592 Patent

at 2:50-55).)

In *Blockbuster*, "the court conclude[d] that the following sections of the specification

provide the structure corresponding to the 'computer readable program code means embodied in

said medium for searching' limitation: 2:50-55; 7:6-10; 4:29-39; 5:60-67; 6:50-66; 6:60-63;

6:66-7:1." *Blockbuster* at 44.

Plaintiff here proposes that the corresponding structure is:

Software programmed to label the content of a web site; register the labeled
accessed content in a visitor data file; store the visitor data file; generate a set of
pre-customized displays; cache the set of pre-customized displays; analyze the
personalized data file of the second visitor and associate the second visitor with at
least one pre-customized display displayed to a previous visitor; and display the
pre-customized display onto a web page accessed by the visitor; *See* Col. 2, Lines

50-55; Col. 4, Lines 29-39; Col. 5, Lines 60-67; Col. 6, Lines 50-66; Lines 60-63; Col. 6, Line 66 – Col. 7, Line 1; Col. 7, Lines 6-10.

(Dkt. No. 171, Ex. C, at 5.)

Because the ". . . means . . . for searching . . ." is recited as comprising the other means-plus-function limitations that are addressed in subsections (a) through (g), above, construction of the ". . . means . . . for searching . . ." would be redundant. *Cf. Funai Elec.*, 616 F.3d at 1366 ("The criterion is whether the explanation aids the court and the jury in understanding the term as it is used in the claimed invention."). Instead, the definiteness of the ". . . means . . . for searching . . ." limitation turns on the definiteness of those other limitation. Because the Court has rejected Defendants' indefiniteness arguments as to those other means-plus-function limitation, as discussed in subsections (a) through (g), above, the Court hereby expressly rejects Defendants' indefiniteness argument as to the ". . . means . . . for searching . . ." limitation.

No further construction is necessary. *See U.S. Surgical*, 103 F.3d at 1568 ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy."); *see also O2 Micro*, 521 F.3d at 1362 ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims."); *Finjan*, 626 F.3d at 1207 ("Unlike *O2 Micro*, where the court failed to resolve the parties' quarrel, the district court rejected Defendants' construction.").

## V. CONCLUSION

The Court adopts the constructions set forth in this opinion for the disputed terms of the patents-in-suit. The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered

to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury.  Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

Within thirty (30) days of the issuance of this Memorandum Opinion and Order, the parties are hereby ORDERED, in good faith, to mediate this case with the mediator agreed upon by the parties.  As a part of such mediation, each party shall appear by counsel and by at least one corporate officer possessing sufficient authority and control to unilaterally make binding decisions for the corporation adequate to address any good faith offer or counteroffer of settlement that might arise during such mediation.  Failure to do so shall be deemed by the Court as a failure to mediate in good faith and may subject that party to such sanctions as the Court deems appropriate.

**So ORDERED and SIGNED this 20th day of November, 2013.**

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE